1

Honorable Thomas S. Zilly

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

8

9

FAIR HOUSING CENTER OF
WASHINGTON,

10

Plaintiff,

11

v.

12

BREIER-SCHEETZ PROPERTIES, LLC, a
Washington corporation; and FREDERICK
BREIER-SCHEETZ, an individual,

13

14

Defendants.

No. 2:16-cv-00922-MAT

PLAINTIFF'S RESPONSE IN
OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS, AND COUNTER-
MOTION FOR SUMMARY JUDGMENT

NOTE ON MOTION CALENDAR:
**January 13, 2017 (Def's Motion)**
**February 3, 2017 (Pl's Motion)**

15

16

17

18

19

20

21

22

23

24

25

26

27

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

## I.    INTRODUCTION

Defendants move under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff's claims. Dkt. 16. They argue Plaintiff has failed to allege facts that would allow "a valid test for difference in proportionate impact." *Id.* at 25. But Defendants' motion to dismiss is untimely under the plain language of Rule 12, which requires defendants to file such motions in lieu of an Answer. *See* Fed. R. Civ. P. 12(b)(6). Defendants filed their Answer six months ago, five months before making their motion to dismiss. Dkt. 9.

Even if the Court overlooks this fatal defect and considers Defendants' motion under Rule 12(c), it should deny the motion because Plaintiff's Complaint met the simple pleading standards of Rule 8. Indeed, Defendants admit they enforce the occupancy restriction that Plaintiff alleges, and the Complaint—supported by admissible findings and determination of "reasonable cause" by the Seattle Office of Civil Rights, which cited statistical evidence— pleaded more than plausible claims of disparate impact discrimination.

Together with the evidence supplied in support of Plaintiff's opposition, Plaintiff establishes not only that its claims are plausible but also that it prevails as a matter of law. Accordingly, Plaintiff cross-moves for summary judgment on liability. The Court should deny Defendants' untimely and meritless motion, and find Defendants liable for violating the Fair Housing Act, Washington's Law Against Discrimination, and the Seattle Municipal Code**.**

## II.    FACTS

The Granada is a 96-unit apartment building in Seattle. Ex. A to Decl. Jesse Wing (Defs' Amended answers to Pl's discovery) at Ans. to Interrogatory (ROG) No. 4; Dkt. 1 (Complaint) at ¶ 4.1, Dkt. 9 (Answer) at ¶ 4.1. Two-thirds (sixty) of those units are studio apartments of at least 400 square feet. Ex. A to Wing Decl. at Ans. to ROG No. 10); Dkts. 1, 9 at ¶ 4.1, respectively.[1] None of the studios has a designated parking space. Ex. A to Wing Decl. at Ans. to ROG No. 4.

---

[1] Failure to deny allegations in the Complaint constitute judicial admissions of the matters alleged. Fed.R.Civ.P. 8(d). No additional evidence is required to prove the matter so admitted. *Lockwood v. Wolf Corp.*, 629 F.2d 603, 611 (9th Cir. 1980) (affirming summary judgment: "failure to deny the allegation in its answer to the [] complaint constitutes an admission.")

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 1

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

Defendants admit they employ the discriminatory policy that is the gravamen of this litigation: they allow only single persons to rent The Granada's studio apartments. Ex. A to Wing Decl. at Ans. to ROG No. 4; Dkts. 1, 9 at ¶ 4:12[2]; *see also* Decl. of Jo Ann Huth at 1; Decl. of Gary Huth at 1. Defendants claim in this litigation that they imposed the policy because the building has limited parking, and single tenancy results in less tenant turnover and lower water, sewer, garbage, gas, and electricity expenses. Ex. A. to Wing Decl. at Ans. to ROG No. 4. They did not repeat the original justification that Defendant Scheetz gave to SOCR investigators: that his restriction is "simple." Dkts. 1, 9 at ¶ 4.12; *see also* Ex. A to Dkt. 1 (SOCR Findings of Fact and Determination). Defendant Scheetz, who owns the apartments, admits he enforces the policy, and instructs his property managers to do the same. Ex. A to Wing Decl. at Ans. to ROG No. 5; Dkts. 1, 9 at ¶ 4:12.[3] He developed the restriction over time since the late 1970s. *See* Ex. A to Wing Decl. at Ans. to ROG No. 4.

Defendants also admit the Seattle Municipal Code governs habitability standards within the city, and allows two occupants to live in a studio of at least 150 square feet. Dkts. 1, 9 at ¶ 4:15. Defendants acknowledge that because Granada studio apartments far exceed 150 square feet, the city's habitability rules allow at least two people to reside in them. *Id.*

Defendants' admissions reflect investigative findings by FHCW and the Seattle Office of Civil Rights. FHCW conducts fair housing testing to fulfill its mission to ensure equal housing access in Washington. Decl. of Christa Lenssen at ¶ 3. During such tests, trained individuals pose as prospective tenants to gather information about whether a housing provider complies with fair housing laws. Lenssen Decl. ¶¶ 6, 8. A pair of testers typically conducts the test: one poses as a member of the protected class, the other represents the control group. Lenssen Decl. at ¶ 8.

---

[2] "Defendants further admit that they have a policy of renting studio apartments at The Granada to no more than one person for occupancy by that person." Dkt. 9 at ¶ 4.12.

[3] Defendant Scheetz controlled and directed the actions of all property managers and employees, and has himself managed and operated The Granada. Dkts. 1, 9 at ¶ 4:10; Dkt. 1 at 10 (lines 25-26) (SOCR Findings of Fact and Determination).

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 2

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

In 2012 and 2013, FHCW determined The Granada has a policy and practice of restricting its studio apartments to single occupants. Lenssen Decl. ¶ 4. FHCW testing repeatedly confirmed the discriminatory policy and practice. On November 6, 2012, two FHCW testers separately telephoned The Granada. One tester told its manager she wanted to rent a studio apartment for herself and her small child. Decl. of Tester 152 at ¶ 4. The manager told the tester the Defendants will not rent a studio to two people; only one person is allowed to live in those units. *Id.* at ¶ 8; *see also* Jo Ann Huth Decl. at 2. The second tester, No. 385, performed a control test: she asked Granada's manager to rent her a studio apartment, without indicating anyone would live with her. Ex. A to Dkt. 1 at 10-11. The manager raised no concerns about the tester renting a studio; instead, he said two people had already applied for the available unit. *Id.*

On October 11, 2013, another pair of FHCW testers telephoned The Granada. Again, one asked to rent a studio apartment for herself and her child. Decl. of Tester 401 at ¶ 8. The Granada representative responded that Defendants do not allow two people to live in their studio apartments, and Granada management makes no exceptions. *Id.* When the control tester asked about renting a studio apartment, she said nothing about sharing the unit with anyone. Decl. of Tester 405 at ¶ 8. The Granada representative (who identified himself as Defendant Scheetz) told the tester that although he did not yet have any studio apartments available, she should come to The Granada to visit one of the units. *Id.*

In 2014, FHCW filed a Complaint against Defendants with the U.S. Department of Housing and Urban Development. Ex. 2 to Wing Dec. The Complaint alleged the Defendants' occupancy restriction precluding all families from living in its studio units improperly denied or made housing unavailable based on familial status. *Id.* Through a work-sharing agreement with HUD, *see id.* at 4, the Seattle Office for Civil Rights investigated the complaint, Ex. A to Dkt. 1. Defendants admit that when interviewed by SOCR in early 2015, Defendant Scheetz gave three reasons for his single-tenant restriction: (1) "it is a simple policy and it keeps things simple"; (2) "single persons stay longer"; and (3) a single tenant results in less wear and tear on the studio apartments. *Id.* at 4; see also Dkts. 1, 9 at ¶ 4.12. The SOCR issued a formal finding of

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 3

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1  "reasonable cause," that Defendants' policy results in a disparate, adverse impact on persons

2  based on their familial status – a protected class – and therefore violates the Fair Housing Act

3  and the SMC's prohibition against discrimination. Ex. A to Dkt. 1 at 10-11.

4      Plaintiff FHCW filed this action on June 16, 2016, to halt and remedy the Defendants'

5  occupancy restriction of refusing housing to families with children under the Fair Housing Act of

6  1968, as amended, 22 U.S.C. § 3601 *et seq.*; Washington's Law Against Discrimination, RCW

7  49.60 *et seq.*; and the Seattle Municipal Code ("SMC") 14.08, *et seq*. Dkt. 1. Defendants

8  answered Plaintiff's Complaint on July 7, 2016. Dkt. 9. Nearly five months later (on December

9  2, 2016), Defendants moved to dismiss this lawsuit under Fed. R. Civ. P. 12(b)(6). Dkt. 16.

10  ### III.   Legal Analysis

11  **A.    Defendants' Rule 12(b)(6) Motion is Untimely, and in Any Event Futile.**

12      "A Rule 12(b)(6) motion must be made *before* the responsive pleading. Fed.R.Civ.P.

13  12(b)(6)." *Elvig v. Calvin Presby. Church*, 375 F.3d 951, 954 (9th Cir. 2004). "Here, the

14  Defendants filed their motion to dismiss after filing their answer. Thus, the motion should have

15  been treated as a motion for judgment on the pleadings, pursuant to Rule 12(c) or 12(h)(2)." *Id.*

16      "At this stage in the proceedings, [the court must] accept as true all allegations in [the

17  plaintiff's] complaint and treat as false those allegations in the answer that contradict [the

18  plaintiff's] allegations." *Id.* "A complaint should not be dismissed 'unless it appears beyond

19  doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him

20  to relief.'" *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248 (9th Cir. 1997). "The Rule 8

21  standard contains 'a powerful presumption against rejecting pleadings for failure to state a

22  claim.'" *Id.* at 249 (citation omitted); *see also Hall v. City of Santa Barbara*, 833 F.2d 1270,

23  1274 (9th Cir. 1986) ("It is axiomatic that '[t]he motion to dismiss for failure to state a claim is

24  viewed with disfavor and is rarely granted.'") (quoting 5 Charles Alan Wright & Arthur R.

25  Miller, Federal Practice & Procedure § 1357, at 598 (1969)).

26      In filing its Complaint, the Plaintiff need only set forth a short plain statement of a

27  plausible claim, not establish a prima case. In *Gilligan*, a fair housing case, the Ninth Circuit

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 4

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1  explained, "By demanding of the [Plaintiffs] that they establish each element necessary to

2  survive a motion for summary judgment, the district court asked far more of them than the

3  federal rules require at the pleading stage. To plead their disparate treatment claim, the

4  [Plaintiffs] need not make out a *prima facie* case of discrimination." *Gilligan*, 108 F.3d at 249.

5      But this is precisely the premise for Defendants' motion—that FHCW has not shown a

6  statistical disparity sufficient to establish disparate impact. As the Ninth Circuit explained in

7  *Gilligan*, a housing discrimination case, the plaintiff need not plead—let alone establish—the

8  elements of a *prima facie* case: "[F]ailure to plead financial qualification does not diminish the

9  Gilligans' additional disparate impact claim. *See Pfaff*, 88 F.3d at 745 (stating that to set forth a

10 *prima facie* case of disparate impact, a plaintiff need only identify outwardly neutral practices

11 that have a disproportionate impact on . . . a protected class)." *Gilligan*, 108 F.3d at 250.

12     Defendants try to dress their motion in the guise of *Iqbal*, suggesting the FHCW's

13 Complaint lacks statistical evidence to support its claim – so the development of evidence must

14 not be even plausible. But *Gilligan* established that a complaint is not required to plead evidence

15 supporting a *prima facie* case.[4]  Moreover, Defendant is wrong: The FHCW appended to its

16 Complaint SOCR findings that cited statistical analysis supporting its finding of disparate

17

18  ─────────────────

19  [4] As the court in *Friscia v. Flagstar Bank*, FSB, No. C 12-05178 WHA, 2013 WL 1191240, at *2
    (N.D. Cal. Mar. 21, 2013), explained, *Gilligan* lives on after *Iqbal*:

20          While our court of appeals has not published a decision during the *Iqbal/Twombly*
            era regarding the lenient *Gilligan* pleading standard, unpublished opinions support
21          the view that the standard still applies. For example, *Haynes v. R.W. Selby & Co.,
            Inc.*, 338 F.App'x 694, 696 (9th Cir. 2009), reversed dismissal for failure to state
22          a claim when the spare allegations only stated that 'defendants discriminated
            against Haynes by increasing his rent after learning he was African American and
23          Muslim, and that he suffered injuries.' *See also Johnson v. Winn Props.*, 446
            F.App'x 939, 940 (9th Cir. 2011) (citing *Gilligan* with approval); *Anderson v.
24          MCM Const. Inc.*, 2012 WL 6571034 (E.D. Cal. Dec.17, 2012) (Magistrate Judge
            Gregory Hollows) (collecting cases on discrimination pleading standard).
25          Moreover, in the employment discrimination context, our court of appeals has
            recently suggested that in most cases, it will not be any more difficult for a
26          plaintiff today to state a discrimination claim than it was prior to *Iqbal* and
            *Twombly*. *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1050 (9th Cir.
27          2012).

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 5

No. 2:16-cv-00922-MAT
10017.04 jl028501.002

**MACDONALD HOAGUE & BAYLESS**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1    impact.[5] *See* Ex. A to Dkt. 1 at 13-14. SOCR's admissible Findings and Determination are part

2    of Plaintiff's Complaint. Defendants can challenge statistical evidence or methodology through

3    expert testimony at trial, but cannot win dismissal by arguing a Fair Housing claim based on an

4    occupancy restriction that bars 100% of families with children is implausible.

5        Plaintiffs have successfully challenged such occupancy restriction policies under the Fair

6    Housing Act since at least 1991. *See, e.g.*, *Rhode Island Comm'n for Human Rights v. Graul*,

7    120 F. Supp.3d 110 (D.R.I. 2015) (holding on summary judgment, policy requiring minimum of

8    170 square feet for a family of three had disparate impact on families with children in violation

9    of FHA and Rhode Island law); *Gashi v. Grubb & Ellis Prop. Mgmt. Servs., Inc.*, 801 F. Supp.2d

10    12, 16 (D. Conn. 2011) (holding on summary judgment, policy limiting occupancy to no more

11    than two persons per bedroom had a disparate impact on families with children, in violation of

12    the FHA); *United States v. Tropic Seas, Inc.*, 887 F. Supp. 1347 (D. Haw. 1995) (holding on

13    summary judgment, landlord's rule against occupancy of studio or one-bedroom apartment by

14    more than two persons violated FHA); *Fair Hous. Council of Orange Cty., Inc. v. Ayres*, 855 F.

15    Supp. 315, 318 (C.D. Cal. 1994) (granting summary judgment for Plaintiffs against landlord's

16    enforcement of two-person per bedroom occupancy restriction, rejecting as insufficient

17    Defendant's offered business justification "to prevent damage and destruction to the apartments

18    from excessive wear and tear" "to keep the property in good repair and to reduce ongoing

19    maintenance and eventual resale costs."); *United States v. Hover*, No. C 93-20061 JW, 1995 WL

20    55379, at *3 (N.D. Cal. Feb. 8, 1995) (verdict for plaintiff because: "The defendant's occupancy

21    standard of 'one person per bedroom plus one' has a discriminatory effect on families with minor

22    children…. By refusing to allow occupancy by couples with one child in a one bedroom unit,

---

[5] Such government administrative findings are admissible to show discrimination. *See, e.g.,*
*Quinn v. Everett Safe & Lock, Inc.*, 53 F. Supp. 3d 1335, 1339 (W.D. Wa. 2014) (holding
Department of Labor findings of a violation of USSERA admissible); *Plummer v. W. Int'l Hotels*
*Co.*, 656 F.2d 502, 505 (9th Cir. 1981) ("A civil rights plaintiff has a difficult burden of proof,[8]
and should not be deprived of what may be persuasive evidence.[9] We therefore hold that the
plaintiff has a right to introduce an EEOC probable cause determination in a Title VII lawsuit,
regardless of what other claims are asserted, or whether the case is tried before a judge or jury.";
reversing jury verdict because trial court excluded EEOC findings); *Hayson v. Schmadl*, 126
F.R.D. 419 (D.D.C. 1988) (holding HUD findings admissible); Fed.R.Evid. 803(8)(C).

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 6

No. 2:16-cv-00922-MAT
10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1    prohibiting two children in two bedroom units, and absolutely refusing to rent to couples with

2    more than two children, defendants exclude a large percentage of families with children[.]");

3    *United States v. Badgett*, 976 F.2d 1176, 1178 (8th Cir. 1992) (reversing trial court and finding

4    single-person occupancy limit to one-bedroom apartments violated the Fair Housing Act);

5    *United States v. Lepore*, 816 F. Supp. 1011, 1023 (M.D. Pa. 1991) (verdict for plaintiffs, holding

6    that "the two person limitation violates the amended Fair Housing Act and …the court cannot

7    say that the two person requirement is reasonable when defendants have never attempted any

8    alternative," and rejecting inadequate septic system as defense); *Crossroads Residents Organized*

9    *for Stable & Secure ResiDencieS v. MSP Crossroads Apartments LLC, & Soderberg Apartment*

10   *Specialists*, No. CV 16-233 ADM/KMM, 2016 WL 3661146, at *9 (D. Minn. July 5, 2016)

11   (denying motion to dismiss, holding "Because nearly all units at the complex have only one

12   bedroom, Defendants' occupancy standard effectively prohibits more than two persons from

13   living together in one unit. . . . Unsurprisingly, many cases finding that an occupancy standard

14   had a disparate impact based on familial status involved a limit of 2 persons per unit."); *see also*

15   *Snyder v. Barry Realty, Inc.*, 953 F. Supp. 217, 221 (N.D. Ill. 1996) (holding a *prima facie* case

16   of disparate impact was established by use of a number of bedrooms "plus one" occupancy

17   restriction); *HUD v. Carlson*, HUD ALJ 08-91-0077-1, at 16-18 (June 12, 1995) (finding *prima*

18   *facie* case of disparate impact where statistics showed occupancy restriction excluded 58.8% of

19   all families with children and the numerically average family with children), Ex. 3 to Wing Dec.

20        FHCW alleges the occupancy restriction has a disproportionate impact on families with

21   children. Its lawsuit, supported by a SOCR finding of reasonable cause citing a statistical

22   analysis, is no less plausible than the successful challenges cited above. Defendants' motion

23   never proves it is implausible that their restriction has a disparate impact. They cannot show that

24   because FHCW's claim is demonstrably plausible: with this motion, the FHCW submits expert

25   testimony proving its claim with compelling statistical evidence developed using the methods

26   Defendants claim are required. Dismissing this action for not pleading a plausible claim would

27   be wrong, and would be futile since FHCW would simply refile including this evidence.

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 7

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

**B.    Plaintiff Cross Moves for Summary Judgment in its Favor**

Rule 12(b)(6) states, when "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b)(6). The FHCW submits evidence opposing Defendants' improper motion to dismiss and supporting its claims on a cross motion for summary judgment, so the Court should consider both motions under Rule 56.

**C.    The 1988 Fair Housing Act Amendments Prohibit Unjustifiable Occupancy Restrictions to Remedy Severe Lack of Affordable Housing for Families.**

Eradicating housing discrimination against families with children is a top national priority. "In 1988, Congress amended portions of the Fair Housing Act to prohibit discrimination on the basis of 'familial status.' The language of these amendments is broad, according families ... essentially the same protections as racial minorities." *United States v. Lepore*, 816 F. Supp. 1011, 1016 (M.D. Pa. 1991). These amendments to Title VIII provide critical protection for families with children, who face severe shortages in housing options, especially in tight housing markets such as Seattle. "Congress indicated that these amendments are intended to alleviate the squeeze on affordable housing stock for families with children and to protect such families from eviction or inability to find reasonably priced places to live."[6] *Id.* at 1017. Occupancy restrictions exacerbate this epidemic by reducing the housing available to families and forcing them to rent larger, more expensive units. "[T]here is a significant increase in cost between a one-bedroom and a two-bedroom apartment." *United States v. Badgett*, 976 F.2d, 1176, 1179 (8th Cir. 1992). "Many (if not most) families cannot afford to provide separate bedrooms for each of their

---

[6] "As the [Congressional] Select Committee on Children, Youth, and Families has documented, the number of families who cannot afford or even find adequate housing is skyrocketing .... The most vulnerable families - young families with children, single-parent families, and poor families - have suffered serious declines in family income over the last decade.... The increasing demands in an already overwhelmed rental market have left millions of families stranded. A 1986 nationwide study found that 8 million low-income renters were competing for only 4 million affordable vacant units." *Lapore*, 816 F. Supp. at 1017 (citation omitted).

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 8

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1    children." *Snyder*, 953 F. Supp. at 221 (occupancy restriction of four persons preventing a couple

2    with five kids from renting three-bedroom apartment established *prima facie* case).

3         The Washington Law Against Discrimination (WLAD) likewise prohibits housing

4    discrimination based on "families with children status," RCW 49.60.222; RCW 49.60.040(13)

5    (defining "families with children status"), as does the Seattle Municipal Code, 14.08.040(A)

6    (prohibiting "familial status" discrimination).[7]

7         Defendants' restriction significantly and illegally harms families, "den[ying] the housing

8    [they] desired on impermissible grounds," *Badgett*, 976 F.2d at 1179, and "restricting their

9    choice of housing," *United States v. Tropic Seas. Inc*., 887 F. Supp. 1347, 1360 (D. Haw. 1995).

10   **D.    Plaintiffs Have Established a *Prima facie* Case of Disparate Impact Discrimination**

11        The Fair Housing Act does not require proof of discriminatory intent. *See Pfaff v. HUD*,

12   88 F.3d 739, 746 (9th Cir. 1996). A plaintiff may establish a violation by showing a disparate

13   impact upon a protected class. *See Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ( "a

14   plaintiff can establish a Fair Housing Act discrimination claim under a theory of disparate

15   treatment or disparate impact"); *Pfaff*, 88 F.3d at 745. "If the result of [a facially neutral] policy

16   is a disparate impact on a protected class, facial neutrality will not save the restriction from

17   violating the Act." *Badgett*, 976 F.2d at 1179. A *prima facie* case of disparate impact in housing

18   discrimination requires a showing of "(1) the occurrence of certain outwardly neutral practices,

19   and (2) a significantly adverse or disproportionate impact on persons of a particular type

20   produced by me defendant's facially neutral acts or practices." *Gamble v. City of Escondido*, 104

---

[7] RCW 49.60.222 is not only similar to the federal Act, but the agency charged with implementing the Fair Housing Act, HUD, has certified that RCW 49.60 is "substantially equivalent" to the FHA, 59 Fed. Reg. 56,088 (Nov. 10, 1994), in "the substantive rights protected by such agency…." 42 U.S.C. § 3610(f)(3)(A)(i). The Washington Human Rights Commission has also proposed regulations "to ensure that the state fair housing laws are substantially equivalent with the [FHA]…." W.S.R. 96-06-087. Similarly, the Seattle Office of Civil Rights in its Findings and Determination in this case, applied the federal analysis to the Seattle ordinance. *See* Ex. A to Dkt. 1. Accordingly, this court should interpret Washington and Seattle law consistent with federal law here. *See Keith v. Volpe*, 858 F.2d 467, 485 (9th Cir. 1988) (applying Fair Housing Act interpretation to California fair housing law).

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 9

No. 2:16-cv-00922-MAT
10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1  F.3d 300, 306 (9th Cir. 1997). Statistical evidence is admissible to establish a *prima facie* case of

2  disparate impact under the Fair Housing Act. *See Pfaff*, 88 F.3d at 746.

3      The Defendants' strict one-person-per-studio unit occupancy restriction constitutes an

4  "outwardly neutral practice" causing disparate impact liability under the Fair Housing Act. Their

5  facially neutral policy has a significant adverse and disparate impact upon families with children.

6  This impact is shown statistically by the Declaration of Dr. Avery Mason Guest, a Professor

7  Emeritus of Sociology and Geography at the University of Washington. Dr. Guest uses statistical

8  methodology accepted for decades by courts in housing and other discrimination cases to

9  establish the obvious substantially adverse impact of Defendants' restriction.

10      By definition, a familial household must consist of more than one individual. Declaration

11  of Avery Mason Guest, at pages 19, 21. Therefore, because no family with a child could reside in

12  their studio apartments, the Defendants' one-person-per-bedroom occupancy restriction serves to

13  exclude 100% of family and married couple households in King County. *Id.* at 20-22. So, the

14  Defendants' policy is the most restrictive possible.

15      A sociologist and demographer, Dr. Guest demonstrates through multiple statistical

16  approaches using United States Census Bureau data for King County that the Defendants'

17  occupancy restriction has a substantial adverse and disproportionate impact on households

18  containing children. His primary approach follows that relied upon the court in *Rhode Island*

19  *Comm'n for Human Rights v. Graul*, 120 F. Supp.3d 110, 129 (D.R.I. 2015), to hold a landlord's

20  occupancy restriction caused disparate impact on families with children in violation of the law.

21  Dr. Guest applies the same methodology followed by the plaintiff's expert that was accepted by

22  the *Graul* court, which found disparate impact through that method, and he applies other well-

23  accepted methodologies. *See* Guest Decl. at 3, 21-22.

24      Disparate impact can be demonstrated by applying a standard often used in employment

25  cases: the "four fifths" rule. That rule assesses whether the selection rate for a protected class is

26  less than four-fifths, or 80%, of the group with the highest selection rate. If the differential is

27  greater than this 20% gap, generally a disparate impact exists. *See* 29 C.F.R. § 1607.4(D). This

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 10

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1    standard is "instructive" in analyzing disparate impact claims, *see Bouman v. Block*, 940 F.2d

2    1211, 1225 (9th Cir. 1991), and has been applied to disparate impact claims in housing

3    discrimination cases, *see Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 50 (1st Cir. 2000)

4    (affirming district court's reliance on the four-fifths formula in disparate impact housing

5    discrimination case); *cf. Pfaff*, 88 F.3d at 745 n.l (stating that, for housing discrimination claims,

6    "we may look for guidance to employment discrimination cases"). Here, Dr. Guest shows this

7    standard is met through multiple accepted statistical approaches.

8        **The Ratio Disparity Approach** "creates a version of the four-fifths rule that can be

9    generally applied to housing cases where the policy has an adverse impact on those affected."

10   Guest Decl. at 11.  "We could call this the Five-Fourths Rule or, perhaps a less confusing term

11   would be the 125% Rule. This format has the advantage of a direct link between the size of the

12   disparity ratio and the impact of the disparity. The larger the disparity ratio, the greater the

13   disparate impact on the protected class group. Moreover, this format translates easily into an

14   assessment of the magnitude of the disparities." *Id*. The plaintiff's expert presented this

15   approach in *Rhode Island Comm'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, 129 (D.R.I.

16   2015), and the court relied upon it to find the landlord's occupancy restriction had a disparate

17   impact on families with children. Here, Dr. Guest too finds disparate impact using this approach:

18   As indicated above, I can calculate disparity ratios from the sample data as our
19   best measures of the distribution of children across household sizes. Following
     Dr. Bradford's approach to disparity through the five-fourths rule, I can clearly
20   demonstrate disparity. Let's take the cases of three and four+ persons per
     household. I find that the disparity ratio for three-person households is 5.22
21   (34.74 percent divided by 6.65 percent). The disparity ratio for four+-person
     households is 13.44 (52.41 percent divided by 3.90 percent). Clearly, the relative
22   percentages of three and four+-person households are much greater for
     households with children, indicating their relative difficulty in qualifying for the
23   Grenada with its one-person per unit requirement.

24   However, if I follow Bradford's procedure for the one and two-person
25   households, the resulting patterns will be quite different. The disparity ratio for
     the one-person households is 0 (0.00 percent divided by 47.95 percent); the
26   disparity ratio for the two-person household would be .31(12.85 percent divided
     by 41.50 percent). Thus, these types of households with children have low
27   percentages relative to similar sized households without children. But one-person

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 11

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

households with children are extremely unlikely given common social and legal standards. Even though two-person households with children are under-represented relative to two-person households without children, those with children still form by almost any standard a significant share of households with children. Furthermore, the one person per unit rule as practiced by the Granada may discourage the formation of two-person households with children.

I could obtain much different disparity ratios by following the alternate approach, the fourth-fifth rule. In this situation the disparity ratios would be high for the 1 (47.95/0.00) and two-person (41.50/12.85) households and low for the three (6.65/34.74) and four+-(3.90/52.41) person households.

The key point is that, regardless of the approach to calculating the disparity ratio, the distributions of households between those without and with children are quite strikingly different. Whenever these ratios are extremely high or low, as in this situation, there are clearly striking differences in household structure that will influence housing opportunities, given various rules for the maximum household sizes. I return to this issue in the next section where I make other statistical comparisons.

Guest Decl. at 19-20.

He likewise finds disparate impact using an **Overall Comparison Approach**:

**Comparison No. 1** compares the percentage of households containing the protected classes (i.e., with a child) that are excluded by the landlord's policy to the percentage of households of the protected and unprotected class in the rental and general population of King County who are excluded by the landlord's policy. *Id.* at 20. This approach has been widely recognized by courts. *See Green v. Sunpointe Assoc., Ltd.*, No. C96-1542C, 1997 WL 1526484, at *5 (W.D. Wa. May 12, 1997) (citing *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 929, 938 (2d Cir. 1988).

Dr. Guest shows that "The results of this statistical approach reveal a substantial disproportionate impact":

First, I focus on the number of renters who pay enough to live at The Granada. I determine (among these renters) the percentage of excluded households (those having more than one member). These are all households in the rental group with more than one resident, regardless of the presence of children. Some 64.84 percent of this group are excluded from The Granada. I then compare this with the analogous percent of the protected renters (who have a child) that are excluded.

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND PL'S MOTION FOR SUMMARY JUDGMENT - 12

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

> This is 100 percent since, according to the census data, all households with children have at least two members.

> Conclusion: Having a child has a great impact on exclusion. Having more than one household member also has an impact but the greatest impact of The Granada policy seems to occur for households with children.

*Id*. at 20.

**Approach No. 2** compares the percentage of households containing the protected classes in the rental population that are excluded to the percentage of households not containing the protected classes in the general population in King County. Courts also have adopted this approach. *See Green*, 1997 WL 1526484, at *4-5; *Betsey v. Turtle Creek Assoc.*, 736 F.2d 983, 987-88 (4th Cir. 1984) (finding disparate impact using this method where 54.3% of blacks were affected compared to only 14.1% of whites). As Dr. Guest found:

> Second, I compare the percentage of rental households in the protected class (of having children) that are excluded to the percentage of households not containing children in the rental population in King County.

> The sample data show that 100 percent of the protected rental class (having children) are excluded. This occurs because all households with children have at least two members, contrary to The Granada policy. I then focus on the renters in the non-protected class (having no children). Of these households, 52.16 percent are excluded from residence at The Granada. This occurs because slightly more than half of the childless households have only one person.

> Conclusion: Having a child excludes one from residence at The Granada. Not having a child excludes about half the other renters.

*Id*. at 20.

**Approach No. 3** compares the percentage of households containing the protected classes in the rental population that are excluded to the percentage of households containing the protected classes in the rental population in King County. Courts also have adopted this third comparison approach to determine disparate impact. *See Green*, 1997 WL 1526484, at *5; *Mountain Side Mobile Estates v. Secretary, HUD*, 56 F.3d 1243, 1253 (10th Cir. 1995); *Betsey*, 736 F.2d at 987-88. Dr. Guest explained that this comparison also shows substantial disparity:

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 13

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

Third, I compare the percentage of households in the protected class in the rental population that are excluded from the Granada to the percentage of households in the protected class in the rental population in King County.

The sample data show that 100 percent of households with protected status (having a child) are excluded. The percentage of protected households in the King County rental population is 26.67 percent.

Conclusion: Households with children are a significant segment of the King County rental population. Given their numbers, the Granada's occupancy restriction has substantively negative impact on the availability of housing for families with children.

*Id*. at 21.

The statistical disparities described by Dr. Guest, including the 100% exclusion of families, establish a strong *prima facie* case of disparate impact under the Fair Housing Act. Indeed, as cited above on pages 6-8, numerous other courts have found occupancy restrictions even *less* restrictive than that of The Granada establish a *prima facie* case of disparate impact against families with children, and held defendants liable for those policies.

The comparisons shown by Dr. Guest reveal that the gaps at issue exceed 20%, satisfying the four-fifths rule. *See* Guest Decl. at 19-21. In summary, Dr. Guest has shown that:

A policy or practice that prohibits occupancy of an apartment by more than 1 person per housing unit has a statistically significant disparate impact on households with children in King County, WA. Almost by definition, it eliminates any one-person households that have residents below 18 years. But the policy or practice that prohibits occupancy of an apartment by more than one person also has a negative relationship with housing opportunities for households with children, almost always at least two persons (an adult and a child) in number.

The differences in the effect of the presence of children within households of the same size are striking. By using the index of dissimilarity, I showed that over three-fourths of all households with children would have to redistribute themselves across household size classes to have the same distribution as households without children.

…

Again following Dr. Bradford's general approach, I find that King County sample differences by household size between the childless and the child-present households in the King County population are statistically significant at the 95

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 14

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

percent confidence level. This allows me to express a great deal of certainty that the patterns and disparities I found in the King County census sample are also evident to a high degree in the universe of King County rental households. Using statistical inference, I can be certain that the general patterns are followed.

Guest Dec. at 21-22.

As a result of Dr. Guest's strong statistical findings of adverse disproportionality, the Fair Housing Center has established a *prima facie* disparate impact case that raises the presumption Defendants illegally discriminate because of familial status, in violation of the Fair Housing Act, the WLAD, and the Seattle Municipal Code. This presumption shifts the burden to Defendants to establish a business necessity for their presumptively illegal occupancy restriction.

**E.    The Compelling Business Necessity Test Governs Occupancy Restriction Cases**

Under the Fair Housing Act, once the plaintiff demonstrates a *prima facie* case of disparate impact, liability is established unless the defendant can prove its "affirmative defense of business necessity." *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 250–51 (9th Cir. 1997). At that point, "a presumption of illegality arises." *Ayres*, 855 F. Supp. at 318. "If a *prima facie* case of disparate impact is shown, defendants may rebut it by demonstrating that a business necessity justifies the impact." *Green*, 1997 WL 1526484, at *2 (*citing Pfaff*, 88 F.3d at 745).[8]

The compelling business necessity test is "a standard akin to constitutional strict scrutiny." *Ayres*, 855 F. Supp. at 318; *see also Pfaff*, 88 F.3d at 743, 747-48, *Fair Hous. Congress v. Weber*, 993 F. Supp. 1286, 1292 (C.D. Cal. 1997). Such "exemptions from the Fair Housing Act are to be construed narrowly, in recognition of the important goal of preventing

---

[8] After the passage of the 1988 Fair Housing Act Amendments, HUD used a "reasonableness" standard. *See Badgett*, 976 F.2d at 1180. In 1993, however, HUD amended its interpretation so that a defendant's rebuttal in occupancy cases must satisfy a "compelling business necessity" test. *Pfaff*, 88 F.3d at 747 (citing *HUD v. Mountain Side Mobile Estates* ("Mountain Side II"), 2 Fair Hous.-Fair Lending (P-H) ¶25,064 (HUD Sec'y, Oct. 20, 1993), rev'd in part, *Mountain Side Mobile Estates v. Secretary, HUD*, 56 F. 3d 1243 (10th Cir. 1995). HUD is the agency primarily responsible for implementing and administering the Fair Housing Act so its interpretations of the Fair Housing Act are therefore "entitled to great weight" and "considerable deference." *Pfaff*, 88 F.3d at 747 (citing *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91,107 (1979); 42 U.S.C. § 3608(a); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 210 (1972); *Harris*, 183 F.3d at 1051). Therefore, absent extraordinary circumstances, which are not present in this case, the compelling business necessity test was "the new standard" that became applicable in the Ninth Circuit. *Pfaff*, 88 F.3d at 748.

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 15

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1   housing discrimination." *United States v. City of Hayward*, 36 F.3d 832, 837 (9th Cir. 1994).

2   Therefore, Defendants bear the burden to prove their occupancy restrictions are exempt from the

3   Fair Housing Act. *See id*. at 837 (familial status discrimination defendant carries burden to prove

4   exemption to Fair Housing Act); *Fair Hous. Advocates Ass'n. Inc., v. City of Richmond Heights*,

5   209 F.3d 626, 634 (6th Cir. 2000) (same); *Hogar Agua y Vida en el Desierto v. Suarez-Medina*,

6   36 F.3d 177, 182 (1st Cir. 1994) ("exemptions from the requirements of a remedial statute--like

7   the FHA—are to be construed narrowly to limit exemption eligibility"). The Defendants carry a

8   heavier burden of rebuttal in cases alleging disparate impact than in cases of disparate treatment.

9   *See Pfaff*, 88 F.3d at 747. Here, the Fair Housing Center has statistically proven such

10  discriminatory effect, so the Defendants bear the burden of rebuttal.

### F.  Defendants Have No Compelling Business Necessity for Their Occupancy Restriction

11
12

13  The Defendants have failed to demonstrate a compelling business necessity for their one-

14  person-per-studio unit occupancy restriction. Indeed, they have no facts that support their bald

15  assertion that their occupancy limit is even reasonable.

16  ### 1.  Their Subjective Justifications Fail as a Matter of Law

17  The Defendants have presented no evidence to justify an occupancy restriction that

18  discriminates against 100% of families. When the owner, Defendant Frederick Scheetz, was

19  interviewed by the Seattle Office of Civil Rights, he offered three rationales for the occupancy

20  restriction:  (1) the restriction is simple; (2) he believes single residents move less often; and (3)

21  the possibility of higher utility bills, and the possibility of greater wear and tear. Then, in

22  litigation, he dropped the first excuse but added a new one:  the apartments have limited parking.

23  The first excuse is nonsensical. There is nothing reasonable, let alone necessary, about

24  restricting housing in a way that adversely impacts a protected class on the ground that it is

25  simple. And restricting residency to one person is no simpler than restricting it to two people.

26  Indeed, it is more complicated than imposing no restriction at all.

27

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 16

No: 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

Defendant Scheetz's second reason, perceived a higher tenant turnover when more than two person rents together, is entirely unsupported. His sworn answers to discovery acknowledge that he has no records and no data to support his perception. Bare guesswork is insufficient to establish reasonableness let alone business necessity. Nor does his claimed perception that single residents stay put longer than couples or families comport with common experience. Families lean toward stability. They can be counted on to take into account any disruption to their children's lives, schooling, and friendships before deciding to move. And couples often will consider the ties that both of them have made and their respective employments before deciding to move. In contrast, a single person is more likely to have the freedom to act without such considerations. The Defendants bear the burden of proving to the contrary, and that it is reasonable and necessary for business to adopt a one-person-per-unit occupancy restriction to avoid the harm purportedly caused by the perceived risk that two or more residents will move more frequently, and meaningfully so, than a single resident. They have no evidence to support this justification.

Defendants also have no data to support their assertion that utilities and wear and tear are higher with more than one person, let alone significantly higher. Defendant Scheetz has collected no data on a per-apartment or per-person basis; he does not know what additional cost or wear, if any, additional occupants would create. *See* Ex. 1 to Wing Decl. (Ans. to ROG 4) ("There is no current system for tracking data supporting the policy.")  Likewise, Defendant Scheetz has offered no calculations of how much money, if any, Defendants purportedly save on utility bills or wear and tear by limiting occupancy in its studio apartments to one person. *See id.*

Finally, Defendants cannot show limited parking necessitates restricting their studio units to single residents. First, many families with children include only one adult (or driver) so excluding them all based on number of residents is a gross misalignment with the stated purpose. Second, Defendants could readily and easily address the issue by limiting the number of parking spots per unit. Applicants seeking more parking can look elsewhere rather than be turned away.

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 17

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1    Defendant Scheetz has not explained any effort to investigate, evaluate, or confirm the

2    reasons for his speculation that a one-person-studio unit occupancy restriction significantly

3    achieves any legitimate business need. *See id*. In order to successfully meet the business

4    necessity standard, a defendant must present "objective evidence" to justify an occupancy

5    restriction. *United States v. Hover*, No. C 93-20061 JW, 1995 WL 55379, at *3 (N.D. Cal. Feb.

6    8, 1995) ("An occupancy standard which forbids family members from sharing a bedroom is

7    presumptively discriminatory on the basis of familial status unless the defendants can prove

8    through objective evidence a business necessity sufficiently compelling to justify the challenged

9    practice.") (citing *Betsy v. Turtle Creek Assn*., 736 F.2d 963, 988 (4th Cir. 1984); *Fair Hous.*

10   *Council of Orange Cty., Inc. v. Ayres*, 855 F. Supp. 315, 319 (C.D. Cal. 1994) ("Defendant has

11   not cited authority to show that such economic judgments constitute a compelling necessity, nor

12   has defendant produced evidence to demonstrate that the occupancy restriction is closely tailored

13   to serve his goals. He simply relies on his own subjective judgment which, notwithstanding his

14   experience in the real estate industry, falls short of the necessary showing."); *Rhode Island*

15   *Comm'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, 129 (D.R.I. 2015) ("Defendants have

16   failed to submit evidence supporting that speculation" that its infrastructure could not sustain a

17   higher occupancy of apartments); *see also Mountain Side II*, 2 Fair Hous.-Fair Lending (P-H) at

18   ¶25,064 (*citing Dothard v. Rawlinson*, 433 U.S. 321, 331-32 (1977); *Albermarle Paper Co. v.*

19   *Moody*, 422 U.S. 405, 428 n.23 (1975) (under Title VII defendant must produce more than

20   "vague and unsubstantiated hearsay" to rebut a *prima facie* case); HUD Handbook at 2-41 –

21   2-42,[9] Ex. 4 to Wing Decl.

22   Even when it applied the lower reasonableness standard under the unusual circumstances

23   in *Pfaff*, the court made clear that a landlord must present credible evidence justifying his

24   occupancy restriction. In *Pfaff*, the Ninth Circuit noted the property owners had carefully

25   ───────────────

26   [9] "[T]he respondent must do more than simply articulate some legitimate, nondiscriminatory reason for its challenged policy, practice, or standard. Rather, the respondent must show that its selection technique has a manifest relationship to the housing in question. The justification must

27   be substantial." HUD Handbook at 2-41 - 2-42, Ex. 4 to Wing Decl.

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 18

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1   considered the size of the house, the size of the lot, the size of the bedrooms, the presence of

2   amenities, the room layout, the traffic patterns inside the house, and the general practice of

3   landlords in the area. *See Pfaff*, 88 F.3d at 742, 749. Here, Defendants failed to consider even a

4   single one of the factors suggested by the *Pfaff* court. The Defendants' explanation falls far short

5   of the conclusive evidence needed to prove a business necessity, and they would be liable even

6   under a reasonableness standard. Likewise, Mr. Scheetz has not identified any professional he

7   consulted to evaluate any of his concerns about utility costs in the nearly thirty years that

8   Defendants have maintained their presumptively illegal occupancy restriction since the Fair

9   Housing Act was amended in 1988. The *Pfaff* case differs in this manner as well. The Pfaffs

10  presented expert testimony, *Pfaff*, 88 F.3d at 749, whereas Defendant Scheetz has only his own

11  subjective views -- uninvestigated, unsupported, and unsubstantiated.

12         Disparate impact challenges to occupancy restrictions would be rendered meaningless if a

13  defendant could simply offer his subjective belief, unsubstantiated by evidence, as support for a

14  restrictive occupancy limit. Allowing landlords to rely on a genuine business need for an

15  occupancy restriction is a narrow exception to the Fair Housing Act's protection of families with

16  children. The exception would become the rule, however, with no protection against disparate

17  impact, if a landlord such as Defendant Scheetz could succeed in litigation by asserting a vague

18  and generic justification for an occupancy restriction based on zero evidence. His "subjective

19  judgment" is legally insufficient to justify an occupancy restriction which has a discriminatory

20  effect on families. *Ayres*, 855 F. Supp. at 319; *HUD v. Ineichen*, HUD ALJ 05-93-0143-1, 7-8

21  (Apr. 4, 1995), Ex. 5 to Wing Decl.; *Lepore*, 816 F. Supp. at 1023.

22       **2.  Defendants' Occupancy Policy is More Restrictive than Applicable HUD**

23          **Guidelines and State and City Housing Standards**.

24         The Defendants' occupancy limit is more restrictive than the occupancy standards relied

25  on by HUD, the Washington State Human Rights Commission (WSHRC), and the City of

26  Seattle, further illustrating that their policy is unnecessary and invalid. This issue also

27

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 19

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1   distinguishes this case from *Pfaff*, in which the Ninth Circuit specifically noted that "no state or

2   local occupancy standards" applied to the Pfaffs. *Pfaff*, 88 F.3d at 742.

3   Rejecting each of Defendants' excuses, the Seattle Office of Civil Rights issued a formal

4   Finding and Determination that:  "Respondent's reasons are arbitrary, unnecessary barriers that

5   are not supported by evidence. Respondent relies on their subjective judgment which,

6   notwithstanding their experience in real estate, falls short of the necessary showing."  Dkt. 1 at

7   14. Its finding and determination are not only persuasive, but are consistent with case law and

8   with guidance of federal, state, and local agencies tasked with implementing fair housing law.

9   ### a. HUD Guidelines

10   In its 1991 "Keating Memo," HUD declared occupancy limitations more restrictive than

11   two-persons-per-bedroom require heightened scrutiny. *See* Fair Housing Enforcement Policy:

12   Occupancy Cases, 63 Fed. Reg. 70983 (HUD Dec. 23, 1998), Ex. 6 to Wing Dec. Such policies

13   are automatically "suspect."  *Badgett*, 976 F.2d at 1179. HUD directs investigators reviewing

14   occupancy restrictions that depart from its guidelines to consider unit size, configuration, and

15   physical limitations; bedroom size; the age of tenant children; and state and local housing laws.

16   *See Fair Housing Enforcement Policy: Occupancy Cases*, 63 Fed. Reg. 70983, 70985-86 (HUD

17   Dec. 23, 1998), Ex. 6 to Wing Dec.; *see also Pfaff*, 88 F.3d at 748.

18   ### b. Washington State Human Rights Commission (WSHRC)

19   The agency charged with enforcing the WLAD, WSHRC, has also adopted this standard:

20   "occupancy standards that are less than 2 persons per bedroom generally will raise a question of

21   lawfulness." Washington State Human Rights Commission Guidance Memorandum, *Occupancy*

22   *Standards and Surcharges in Housing Discrimination: Protection from Discrimination Against*

23   *Families with Children*, February 20, 1998, Ex. 7 to Wing Dec. The Defendants' one-person-per-

24   studio policy is obviously more restrictive than HUD's and WSHRC's guidelines, creating the

25   presumption that Defendants' policy violates the Fair Housing Act and the WLAD. The

26   Defendants fail to offer any reasonable justification – let alone compelling business need – to

27   excuse departure from the federal and state administrative standards.

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 20

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1    The WSHRC directs its investigators to consider the same factors as does HUD when

2    reviewing occupancy restrictions that depart from HUD guidelines. *See id*. 1-2. Likewise, the

3    WSHRC has announced that property owners should measure the units, use local zoning and

4    building occupancy codes as a guideline, and "be prepared to substantiate business-related

5    factors" by showing "a clear relationship between the business related factor and the occupancy

6    standard" with expert testimony or other evidence. WSHRC, *Occupancy Standards 101 For*

7    *Housing Providers*, at 1-2, Ex. 8 to Wing Dec. The Defendants, however, have not considered

8    any of these factors. *See* Ex. 1 to Wing Dec. at 5 (ans. to ROG 4).

9                         **c.  City of Seattle Municipal Code**

10    Defendants offer no compelling business necessity for departing from the occupancy

11    standards established by the City of Seattle. The fact a property manager's occupancy limit is

12    more restrictive than required by a municipal housing code suggests the occupancy limit is

13    unjustified. *See Tropic Seas*, 887 F. Supp. at 1362 (finding landlord's occupancy policy more

14    restrictive than city housing code was evidence of illegal discrimination); *Ineichen*, HUD ALJ

15    05-93-0143-1, at 8 (same), Ex. 5 to Wing Dec. Although HUD's and the WSHRC's occupancy

16    standards were meant to offer national and state guidelines respectively, for occupancy policies,

17    the housing provisions and policies of the Seattle Code address the specific housing conditions as

18    they exist in Seattle, where Defendants deny housing to families with children.

19    Seattle Municipal Code deems any unit with 150 square feet of floor area adequate for

20    housing two people; and 200 square feet of floor area adequate for three people. *See* SMC

21    22.206.020(c), Ex. 9 to Wing Dec. All of Defendants' studio apartments exceed 400 square feet,

22    far more than enough to meet the Seattle Code's requirements housing a family of two or three.

23    Indeed, it is easy to imagine a couple with a baby or small child comfortably living in such units.

24    Defendants offer no compelling business necessity to justify their occupancy limit, which is far

25    more restrictive than the Seattle housing code.

26    The SOCR is charged with interpreting and enforcing Seattle's Civil Rights ordinance.

27    Here, the SOCR made a formal written determination that Defendants' policy violates the

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 21

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1    ordinance because it is unduly restrictive and disproportionately impacts families with children.

2    *See* Ex. A to Dkt. 1. The finding is in line with the HUD and WSHRC guidance set forth above.

3        Plaintiff is unaware of any reported court opinion that has upheld the validity of a one-

4    person-per-studio occupancy limit – which, by definition, excludes all families. Opinions that

5    examined less exclusionary policies held they discriminated based on familial status. *See, e.g.,*

6    *Badgett,* 976 F.2d at 1180 (holding illegal one-person-per-bedroom restriction for one-bedroom

7    units); *Ayres*, 855 F. Supp. at 318 (holding one-person-per-bedroom restriction illegal in the

8    context of *two*-bedroom units, as having disparate impact on families).

9        Because the Defendants can provide no reasonable let alone compelling business

10   necessity to rebut the *prima facie* case of disparate impact discrimination, as a matter of law,

11   their occupancy restriction violates, Fair Housing Act, the WLAD, and the SMC.

12   **G.    Even if the Defendants Could Demonstrate a Compelling Business Necessity, They**
     **are Still Liable for Failing to Adopt Less Discriminatory Alternatives.**

13

14       Even assuming, *arguendo*, Defendants could show a compelling business necessity for

15   their occupancy restriction, the Fair Housing Center is still entitled to judgment in its favor

16   because the Defendants' one-person-per-studio restriction is not the least restrictive means of

17   accomplishing their stated objectives. A "defendant must show use of the least restrictive means

18   to achieve a compelling business standard." *Ayres*, 855 F. Supp. at 318. "Once a plaintiff has

19   made a *prima facie* showing of discriminatory effect, a defendant must present bona fide and

20   legitimate justification for its action with no less discriminatory alternatives available."

21   *Huntington Branch NAACP*, 844 F.2d at 939 (racial disparate impact housing discrimination);

22   *Mountain Side*, 56 F.3d at 1254; *see also* 42 U.S.C. § 2000e-2(k)(1)(C) (requiring use of the less

23   discriminatory alternatives test to rebut a *prima facie* case of disparate impact under Title VII);

24   *Albermarle Paper Co.*, 422 U.S. at 425 (same). The existence of reasonable, less discriminatory

25   alternatives was compelling even under the previous reasonableness standard. In a case brought

26   by the Department of Justice, *United States v. Badgett*, the Eighth Circuit declared a one-person-

27   per-bedroom "occupancy restriction is not a reasonable means of dealing with the problem" of

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 22

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1  limited parking, relying in part on its finding that the defendants "never attempted any alternative

2  method" of achieving their goals. *Badgett*, 976 F.2d at 1180; *see also Lepore*, 816 F. Supp. at

3  1023 ("The two person [restriction] figure was arrived at with no experimentation on the part of

4  defendants. It was instead merely a guess on the part of Mr. Lepore's father 25 years ago.")[10]

5  Like in *Lepore*, a "guess on the part of the [landlord] 25 years ago" is insufficient. Defendant

6  Scheetz has no data to support his policy and has not identified any alternatives that he tried.

7         Several less discriminatory alternatives to Defendants' occupancy restriction are

8  available. A few examples include: (1) periodic damage inspections of apartments; (2) lease

9  provisions assigning tenants responsibility for certain damages; (3) lease provisions assigning

10  tenants certain cleaning costs; (4) larger security deposits; (5) charging tenants utility costs; (6)

11  installing meters in apartments to charge each tenant for the water they use[11]; (7) raising rent for

12  all apartments to offset any increase in garbage or sewer bills from multi-occupant apartments;

13  (8) installing sound insulation; (9) enforcing noise complaints; and (10) adopting a parking

14  policy. Defendants' failure to consider or adopt these and other reasonable alternatives shows the

15  Defendants' policy is unnecessary, and, therefore, violates the Fair Housing Act's protection of

16  families. *See Ayres*, 355 F. Supp. at 318 (failure to apply the "least restrictive means" standard

17  "would undermine the protections provided by the [Fair Housing Act]").

18  **H.    Summary Judgment for the Fair Housing Center is Appropriate**

19         The Defendants bear the burden to refute the Plaintiff's *prima facie* case. They have

20  failed, however, to offer any evidence to justify their discriminatory occupancy restriction, to

21  explain their departure from national, state, and local occupancy guidelines, to demonstrate a

22  compelling business necessity for their restriction, and to show that their restriction is the least

23

24  [10] "For example, in one case where the "business necessity" defense failed, the court was
   influenced by the fact that, although the respondent sought to justify an occupancy standard as a
   means of avoiding excessive wear and tear on his units, he admittedly had not considered any of

25  the various alternatives for achieving this goal that the plaintiff suggested (e.g., detailed
   maintenance requirements, more frequent inspections, higher security deposits, and more careful

26  tenancy screening)." *HUD Handbook* at 2-42 - 2-43, Ex. 4 to Wing Decl.

27  [11] In *Lepore*, 816 F. Supp. at 1016, the Court noted that the government's expert estimated that
   the cost of installing water meters could be recovered by an $8.80 increase in rent.

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 23

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1    restrictive means of achieving their stated objectives. Therefore, the Plaintiff is entitled to

2    summary judgment on its disparate impact claims. *See, e.g.*, *United States v. Tropic Seas*, 887 F.

3    Supp. 1347 (D. Haw. 1995) (granting summary judgment against landlord in familial status

4    disparate impact case); *United States v. Weiss*, 847 F. Supp. 819 (D. Nev. 1994) (summary

5    judgment ruling on justification for occupancy restriction in familial status case); *Badgett*, 976

6    F.2d at 1180 (reversing trial court, and ruling for plaintiff after finding, as matter of law, that no

7    reasonable fact finder could accept validity of a one-person-per-bedroom occupancy restriction).

8                                    **IV.  CONCLUSION**

9            The Plaintiffs respectfully request that this court:

10           1.  Declare Defendants liable to the FHCW because it one-person-per-studio policy

11    violates the FHA, the WLAD, and the SMC discriminates against families with children.

12           2.  Enter injunctive relief: (a) barring Defendants from applying a one-person-per studio

13    occupancy restriction and deviating from the Seattle Municipal Code's habitability standard;[12]

14    and (b) ordering Defendants to provide quarterly logs of each residential property to the FHCW

15    for three years, identifying all prospective tenant inquiries and Defendants' responses.[13]

16           3.  Hear Plaintiff's claim for damages at trial, and assess a civil penalty against

17    Defendants for violating WLAD. *See* RCW 49.60.225.

18           DATED January 9, 2017.              MacDONALD HOAGUE & BAYLESS

19                                              /s/Jesse Wing
                                                Jesse Wing, WSBA #27751
20                                              Angela Galloway, WSBA #45330

21    ─────────────────────

22    [12] *See Green v. Sunpointe Assocs., Ltd.*, No. C96–1542C, 1997 WL 1526484, at *7 (W.D. Wa. May 12, 1997) (permanently enjoining landlord from disparate impact against families)

23    [13] *See United States v. Keck*, No. CIV. A. C89-1664-C, 1990 WL 357064 (W.D. Wa. Nov. 15,
24    1990) (requiring landlord in family status discrimination case to report applicant records for three years); *Baumgardner v. HUD*, 960 F.2d 572 (6th Cir. 1992) (requiring records of
25    applicants' sex for two years); *Lapore*, 816 F. Supp. 1011 (M.D. Pa. 1991) (requiring record-keeping and reporting); *Hale v. HUD*, 1985 WL 11179 (W.D. Tenn. Aug. 23, 1985) (consent
26    decree requiring annual reporting); *Hope Inc., v. Dearborn Inv. Group*., No. 83-C8099, 13 Hous. & Dev. Rep. (BNA) 313 (N.D. Ill. Aug. 16, 1985) (requiring monthly reports to fair housing
      organization); *S. California Hous. Rights Ctr. v. Krug*, 564 F. Supp.2d 1138, 1155–56 (C.D. Cal.
27    2007) (requiring list of dwellings available and of persons who inquire or are shown units or who apply; and document denials and the basis).

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 24

No. 2:16-cv-00922-MAT

10017.04 jl028501.002

**MacDONALD HOAGUE & BAYLESS**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1

CERTIFICATE OF SERVICE

2

I certify that on the date noted below I electronically filed this document entitled

3

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

4

AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court

5

using the CM/ECF system which will send notification of such filing to the following persons:

6

Counsel for Defendants

7

George T. Hunter, WSBA # 14388
5900 48th Ave S

8

Seattle, WA 98118
Telephone: 206-851-7700

9

Email: gthunter7700@gmail.com

10

11

DATED this 9th day of January, 2017, at Seattle, Washington.

12

13

*/s/ Esmeralda Valenzuela*
Esmeralda Valenzuela, Legal Assistant

14

15

16

17

18

19

20

21

22

23

24

25

26

27

PL'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AND PL'S MOTION FOR SUMMARY JUDGMENT - 25

No. 2:16-cv-00922-MAT
10017.04 jl028501.002

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604 Fax 206.343.3961