Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

FAIR HOUSING CENTER OF
WASHINGTON,

              Plaintiff,

       v.

BREIER-SCHEETZ PROPERTIES, LLC, a
Washington corporation; and FREDERICK
BREIER-SCHEETZ, an individual,

              Defendants.

No. 2:16-cv-00922-MAT

DECLARATION OF JESSE WING IN
SUPPORT OF PLAINTIFF'S RESPONSE IN
OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS, AND PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

I, Jesse Wing, declare as follows:

I am one of the attorneys for Plaintiff Fair Housing Center of Washington.  I am over the

age of 18, and am competent to testify.

1.     **Exhibit 1** is a true copy of excerpts of Defendants' Amended Answer and

Response to Plaintiff's First Set of Interrogatories and Requests for Production.

2.     **Exhibit 2** is a true copy of Plaintiff's Complaint filed with HUD against

Defendants.

3.     **Exhibit 3** is a true copy of *HUD v. Carlson*, HUD ALJ 08-91-0077-1 (June 12,

1995).

4.     **Exhibit 4** is a true copy of excerpts of the HUD Handbook.

5.     **Exhibit 5** is a true copy of *HUD v. Ineichen*, HUD ALJ 05-93-0143-1 (Apr. 4,

1995).

DECLARATION OF JESSE WING IN SUPPORT OF PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,
AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 1
No. 2:16-cv-00922-MAT
10017.04 ka038503

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1

6.      **Exhibit 6** is a true copy of the "Keating Memo," Fair Housing Enforcement

2      Policy: Occupancy Cases, 63 Fed. Reg. 70983 (HUD Dec. 22, 1998).

3

7.      **Exhibit 7** is a true copy of Washington State Human Rights Commission

4      Guidance Memorandum, *Occupancy Standards and Surcharges in Housing Discrimination:*

5      *Protection from Discrimination Against Families with Children*, February 20, 1998.

6

8.      **Exhibit 8** is a true copy of WSHRC, *Occupancy Standards 101 For Housing*

7      *Providers*.

8

9.      **Exhibit 9** is a true copy of Seattle Municipal Code 22.206.020.

9

10          I declare under penalty of perjury of the laws of the United States of America and the

11      State of Washington that the foregoing is true and correct.

12

13          DATED this 9th day of January, 2017, at Seattle, Washington.

14

15                              */s/ Jesse Wing*                        

16                              Jesse Wing

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF JESSE WING IN SUPPORT OF PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,
AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 2
No. 2:16-cv-00922-MAT
10017.04 ka038503

MacDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1

<u>CERTIFICATE OF SERVICE</u>

2

I certify that on the date noted below I electronically filed this document entitled

3

DECLARATION OF JESSE WING IN SUPPORT OF PLAINTIFF'S RESPONSE IN

4

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, AND PLAINTIFF'S MOTION

5

FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system which

6

will send notification of such filing to the following persons:

7

<u>Counsel for Defendants</u>

8

George T. Hunter, WSBA # 14388
5900 48th Ave S

9

Seattle, WA 98118
Telephone: 206-851-7700

10

Email: gthunter7700@gmail.com

11

12

DATED this 9th day of January, 2017, at Seattle, Washington.

13

14

*/s/ Esmeralda Valenzuela*
Esmeralda Valenzuela, Legal Assistant

15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF JESSE WING IN SUPPORT OF PLAINTIFF'S
RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,
AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT - 3
No. 2:16-cv-00922-MAT
10017.04 ka038503

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

# EXHIBIT 1

TO

DECLARATION OF JESSE WING

IN SUPPORT OF PLAINTIFF'S RESPONSE

IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,

AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1                                          Honorable Thomas S. Zilly

2

3

4

5

6

7                           UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF WASHINGTON AT SEATTLE

8

9  FAIR HOUSING CENTER OF
WASHINGTON,                         No. 2:16-cv-00922-MAT

10             Plaintiff,           PLAINTIFF'S FIRST SET OF
                             INTERROGATORIES AND REQUESTS

11              v.              FOR PRODUCTION TO DEFENDANTS
                             BREIER-SCHEETZ PROPERTIES, LLC

12  BREIER-SCHEETZ PROPERTIES, LLC, a    and FREDERICK BREIER-SCHEETZ
Washington corporation; and FREDERICK

13  BREIER-SCHEETZ, an individual,        AMENDED ANSWER AND RESPONSE

14            Defendants.

15

16  TO:             Defendants

    AND TO:        George Hunter, their attorney

17        Please take notice that Plaintiff submits the following Interrogatories and Requests for

18  Production according to Federal Rules of Civil Procedure 26, 33 and 34.

19        These Requests are directed to all knowledge of Defendants, their agents, insurers,

20  attorneys, and representatives, and to all possible sources of such knowledge, be they

21  documentary, testimonial, or otherwise, which are known to any of the aforesaid or to any and all

22  persons acting on its behalf.  The words "you" and "yours" as used in this document refer to the

23  corporate Defendants and to all of their agents, insurers, attorneys, and representatives.

24        Please answer each of the following Requests separately and fully and under oath.  Space

25  has been provided following each Request for your response.  If the space is insufficient, please

26  attach an additional page or pages.  Moreover, any Request asking you to "identify," "identify

27

PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS
FOR PRODUCTION TO DEFENDANTS - 1

No. 2:16-cv-00922-MAT
10017.04 jh040102.002

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1

2     **REQUEST FOR PRODUCTION NO. 1:**  Please produce all documents related to your

3 response to the preceding interrogatory.

4     <u>**RESPONSE:**</u>

5     See objection to interrogatory NO. 2 above. Without waiving the objection see attached

6 Exhibits A and B.

7

8     **INTERROGATORY NO. 3:**  Please identify the name, home address, home and cell

9 phone numbers, and email addresses of each person who Defendants employ or have employed

10 in the past five years as property managers or who communicate on Defendants' behalf with the

11 public about renting apartments at any of their locations.

12     <u>**ANSWER:**</u>

13     Objection:  The information requested is beyond the scope of discovery under FRCR 26,

14 in that it is overly broad and not reasonably calculated to lead to the discovery of admissible

15 evidence. However, without waiving the objection Frederick Scheetz managed the Granada

16 Apartments for approximately 2 years after the Huths family managed the apartments.

17     Suzanne Harper 6206 20th Avenue NE. Seattle, WA 98115 – ph. 206-324-665, is the

18 current manager of the Granada Apartments.

19

20     **INTERROGATORY NO. 4:**  Regarding each of Defendants' occupancy restrictions,

21 please state the following: who adopted it, when it was adopted, each reason it was adopted and

22 maintained, all supporting data or information on which Defendants relied in adopting it, the

23 identity of each of Defendants' properties at which it applies, in what form and location it is

24 documented, how often Defendants inform their tenants or potential tenants of it at each

25 property, and the name and all contact information of each tenant whose tenancy was terminated

26 or not renewed as a result of the restriction.

27     <u>**RESPONSE:**</u>

PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS
FOR PRODUCTION TO DEFENDANTS  - 5

No. 2:16-cv-00922-MAT
10017.04 jh040|02.002

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1        The Granada Apartments were constructed in 1922. The studio apartments in the

2   building are rented with all utilities included in the rent. Specifically, the rent includes:

3   water, garbage, electricity and gas. The tenant pays only phone and internet. It has been

4   the experience of Defendant that more than one occupant in the 400 square foot studio

5   apartments increases the rate of turnover in those units.

6        All potential tenants are informed regarding restrictions and conditions of

7   occupancy by the Apartment Rental Agreement. No tenant has been terminated or

8   refused renewal as a result of the occupancy policy. More precisely, apartments are

9   regularly advertised on Craig's list, Zillow, vacancy sign and word- of- mouth. The

10  apartment is then shown to the interested person and they are asked if they would like an

11  application. If an application is submitted the manager initially screens the application for

12  such things references, employment or sources of income. No deposit is requested unless

13  the application is approved. The main office runs a credit check before applications are

14  approved.

15       The occupancy policy developed over time beginning in the late 70's or early

16  80's. Mr. Scheetz does not recall all of the reasons for the policy but they include: limited

17  parking (there are 20 parking spaces 96 apartment), less turnover when the studio

18  apartments were occupied by one person, lower expense for water, sewer, garbage, gas

19  and electricity which are all paid by the LLC. There is no current system for tracking data

20  supporting the policy.

21

22

23  **REQUEST FOR PRODUCTION NO. 2:** Please provide all documents or tangible

24  things (including but not limited to policies, records, correspondence, communications,

25  brochures, advertisements, phone logs, notes, and tenant files) related to or reflecting occupancy

26  restrictions at your properties.

27

PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS
FOR PRODUCTION TO DEFENDANTS - 6

No. 2:16-cv-00922-MAT
10017.04 jh040102.002

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1  **RESPONSE:**

2     See attached 5 page rental agreement.

3

4

5     **INTERROGATORY NO. 5:**  Please identify each person responsible for implementing

6  the occupancy restriction policies, practices, and procedures employed by the Defendants.

7     **ANSWER:**

8     Frederick Scheetz,  Gary and Jo Ann Huth, and Suzanne Harper see response to

9  Interrogatory No. 1 above for contact information.

10

11

12     **INTERROGATORY NO. 6:**  Please describe in detail the policies, practices, and

13  procedures employed by Defendants in collecting and evaluating rental applications.

14     **RESPONSE:**

15        Defendant is contacted by potential tenants through walk-ins, phone contact and

16        through the internet.

17

18

19     **REQUEST FOR PRODUCTION NO. 3:**  Please provide all documents or tangible

20  things (including but not limited to records, correspondence, and communications) related to

21  how you attract and evaluate rental applications.

22     **RESPONSE:**

23        See attached Tenant Screening Criteria.

24

25     **INTERROGATORY NO. 7:** Please identify any other lawsuit filed against either

26  defendant alleging discrimination of any type.

27

PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS
FOR PRODUCTION TO DEFENDANTS  - 7

No. 2:16-cv-00922-MAT
10017.04 jh040102.002

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1

2    **INTERROGATORY NO. 10:**  For each property at which Defendants own or operate

3    residential apartments, please state:  the number of apartments, the square footage of each

4    apartment by apartment number/letter, the number of bedrooms of each apartment by apartment

5    number/letter, and any attribute of the apartment that renders it subject to an occupancy

6    restriction enforced by Defendants.

7        **RESPONSE:**

8        Objection:  The information requested is beyond the scope of discovery under FRCR 26,

9    in that it is overly broad and not reasonably calculated to lead to the discovery of admissible

10   evidence. Plaintiff's lawsuit is based upon failure to rent a 400 square foot studio apartment. This

11   interrogatory is not limited and includes multi-bedroom and larger apartments. However, without

12   waiving the objection, Granada Apartments consist of 96 units of which approximately 2/3 are

13   studio units between 400 and 435 sq. ft. None of the studios units have designated parking

14   spaces.

15

16

17

18   **REQUEST FOR PRODUCTION NO. 6:**  Please produce all documents related to your

19   response to Interrogatory No. 10.

20       **RESPONSE:**

21       See answer to Interrogatory No. 10 above.

22

23

24   **INTERROGATORY NO. 11:**  Please state the name, address, and location of any

25   person who the Defendants intend to call as an expert witness, and for each such person, state:

26       a)  the subject matter upon which the expert is expected to testify;

27       b)  the substance of the facts and opinions to which the expert is expected to testify;

PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS
FOR PRODUCTION TO DEFENDANTS  - 9

No. 2:16-cv-00922-MAT
10017.04 jh040102.002

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1    DATED this 28th day of August, 2016.

2                                          MacDONALD HOAGUE & BAYLESS

3

4                                    By:  /s/Jesse Wing_____
                                         Jesse Wing, WSBA #27751
5                                        jessew@mhb.com
                                         Angela C. Galloway, WSBA #45330
6                                        AngelaG@mhb.com
                                         Attorneys for Plaintiff
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS
FOR PRODUCTION TO DEFENDANTS  - 11

No. 2:16-cv-00922-MAT
10017.04 jh040102.002

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

## ATTORNEY CERTIFICATION

I certify that I have read the answers, responses and/or objections to Plaintiff's First Set of Interrogatories and Requests for Production to Defendants, and that to the best of my knowledge, information, and belief, formed after a reasonable inquiry, they are:

(1)     Consistent with the rules and warranted by existing law or a good faith argument for the extension, modification or reversal of existing law;

(2)     Not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and

(3)     Not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

DATED this _11th_ of _November_, 2016.

By: _____
George T. Hunter, WSBA #14388
Gthunter7700@gmail.com
Attorneys for Defendants

PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS
FOR PRODUCTION TO DEFENDANTS - 12

No. 2:16-cv-00922-MAT
10017.04 jh040102.002

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1

## **VERIFICATION**

2

STATE OF WASHINGTON )

3

COUNTY OF KING

4

5

    Defendants, being first duly sworn, upon oath depose and state as follows:  That

6

Frederick Scheetz, is the _____ of Breier-Scheetz Properties, LLC herein; that he

7

has read the foregoing answers and responses to Plaintiff's First Set of Interrogatories and

8

Requests for Production to Defendants in his business and individual capacity, knows the

9

contents thereof and believes the same to be true.

10

11

_____

12

[Printed Name]:  _Frederick Scheetz_

13

14

SUBSCRIBED AND SWORN to before me this _4th_ of _October_ , 2016.

15

16

_____
[Printed Name]:

17

18

NOTARY PUBLIC in and for the State of
Washington, residing at _Sammamish WA_
My appointment expires _9-26-2020_

19

20

21

22

23

24

25

26

27

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

# **EXHIBIT 2**

TO

DECLARATION OF JESSE WING

IN SUPPORT OF PLAINTIFF'S RESPONSE

IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,

AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

HOUSING DISCRIMINATION COMPLAINT

CASE NUMBER:   10-14-0129-8

1. Complainant

Fair Housing Center of Washington
1517 South Fawcett, Suite #250
Tacoma, WA 98402

Representing the Fair Housing Center of Washington;

Lauren Walker, Executive Director
Fair Housing Center of Washington
1517 South Fawcett, Suite #250
Tacoma, WA 98402

2. Other Aggrieved Persons

None.

2. The following is alleged to have occurred or is about to occur:

Discriminatory refusal to rent.

Misrepresentation as to availability of housing.

Discriminatory terms, conditions, privileges, or services and
facilities.

3. The alleged violation occurred because of:

Familial Status.

4. Address and location of the property in question (or if no property
is involved, the city and state where the discrimination occurred):

The Granada Apartments
1736 Belmont Avenue
Seattle, WA 98122

5. Respondents

Gary "Unknown"
Property Manager
1736 Belmont Avenue
Seattle, WA 98122

Joann 'Unknown'
Property Manager
1736 Belmont Avenue
Seattle, WA 98122

Fredrick Scheetz
Property Manager
1736 Belmont Avenue
Seattle, WA 98122

Fredrick Scheetz Properties LLC
    Owner
    1402 3rd Avenue, Ste. 826
    Seattle, WA 98101

        Registered Agent for Fredrick Scheetz Properties LLC:

        Fredrick B. Scheetz
        1402 3rd Avenue, Ste. 826
        Seattle, WA 98101

7. The following is a brief and concise statement of the *facts* regarding
the alleged violation:

From November 6, 2012 to October 11, 2013, the Fair Housing Center
(FHC) conducted three familial status-based tests at the Granada
Apartments.

The first familial status-based test, conducted on November 6, 2012,
indicated differences in treatment towards families with children. The
single tester with children was instructed to disclose that she is
looking for a studio apartment for herself and her two-year old child.
The single tester without children was instructed to inquire about a
studio apartment. When the single tester with children asked Respondent
Joann "Unknown" about a studio unit for herself and her two-year old
daughter, Respondent Joann "Unknown" stated they cannot put two people
in a studio and the studios are one person per unit. Both testers
inquired with Respondent Joann "Unknown" and Respondent Gary "Unknown"
about available units and were provided information about available
units, rental prices, deposits, utilities, and application fees.
Respondent Joann "unknown" wished the single tester with children luck
and apologized that she did not have anything for her. Additional
testing was recommended.

Another familial status-based test was conducted on October 11, 2013,
that indicated differences in treatment towards families with children.
The single tester with children was instructed to disclose that she is
looking for a studio apartment for herself and her child. The single
tester without children was instructed to inquire about a studio
apartment. When the single tester with children asked the unknown agent
about a studio unit for herself and her son, the unknown agent stated they
do not allow two people in their studios and nearly hung up on the tester.
The single tester with children asked the unknown agent about rent, lease
terms, and other details, and the unknown agent stated she could not live
there with two people. The single tester with children asked again if
there were any studios coming available soon. The unknown agent asked how
long the single tester with children planned to live there and stated she
could call back in a week after tenants submitted their move-out notices.
The single tester with children asked the unknown agent if he would
consider allowing her and her son to move in and the unknown agent stated
that would be an exception, they have rules, and they do not make
exceptions. The unknown agent stated management would not allow that and
if they made an exception for the single tester with children, they would
have to make exceptions for others. The single tester with children was
not provided any information about available units, rental prices,
deposits, utilities, lease terms, or application fees. The single tester
without children was told by Respondent Frederick Scheetz about a studio
unit available the following week for $890, and Respondent Scheetz
provided information about deposits, utilities, lease terms, and
application fees.

Testing at The Granada Apartments demonstrates a pattern of
discrimination because of familial status. The Fair Housing Center's
mission has been frustrated by the Respondents' discriminatory
practices in its efforts to assure equal access to housing through
education, referral, counseling, investigation, and other enforcement
activities. Further, the Fair Housing Center has diverted scarce
resources from other duties and activities carried out in support of
our mission to the identification and investigation of the Respondents'
discriminatory actions.

8. **The most recent date on which the alleged discrimination occurred:**

   October 11, 2013.

9. **Types of Federal Funds identified:**

   None.

10. **The acts alleged in this complaint, if proven, may constitute a violation of the following:**

    Sections 804 (a)(b)(d) of Title VIII of the Civil Rights Act of 1968 as
    amended by the Fair Housing Act of 1988.

    **Please sign and date this form:**

    I declare under penalty of perjury that I have read this complaint
    (including any attachments) and that it is true and correct.

For Fair Housing Center of Washington          Date 2/24/14

Note: HUD WILL FURNISH A COPY OF THIS COMPLAINT TO THE PERSON OR
ORGANIZATION AGAINST WHOM IT IS FILED.



## City of Seattle
Ed Murray, Mayor

### Seattle Office for Civil Rights
Patricia Lally, Director

March 20, 2014

Lauren Walker
Fair Housing Center of Washington
1517 South Fawcett  Suite 250
Tacoma, WA  98402

RE:      Notice of Housing Discrimination Charge
         Fair Housing Center of Washington VS Frederick Sheetz
         Properties LLC
         SOCR14HO023; 10-14-0129

Dear Lauren Walker:

This letter is to acknowledge that the above case has been dual-filed with the
Seattle Office for Civil Rights (SOCR) and the U.S. Department of Urban
Development (HUD) for processing.  Your SOCR case number is listed above.
Please keep this information for your records.

As required by law, I have enclosed a document which is a notice of time limits
and your choice of forum.  Please read this information and feel free to ask me
any questions you may have.

You will be notified when your case has been assigned to an investigator.
Please inform SOCR if you make any changes in your address or telephone
numbers or if you will be unavailable for any length of time.  If SOCR is unable to
locate you and you are needed to complete the investigation, your charge may
be dismissed.

SOCR encourages exploration of the possibility of settlement of the charge.  If both parties to this matter show interest in pursuing such a resolution, the Office may suspend the investigative process and provide an opportunity for settlement discussions.  If you are interested in discussing this further, please contact me at (206) 684-4500.

Sincerely,

Michael Chin
Enforcement Manager

Enclosures

**EXHIBIT 3**

TO

DECLARATION OF JESSE WING

IN SUPPORT OF PLAINTIFF'S RESPONSE

IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,

AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
OFFICE OF ADMINISTRATIVE LAW JUDGES

The Secretary, United States
Department of Housing and Urban
Development, on behalf of
James O. and Deplores Bad Horse
and Christina Antelope (minor child),

Charging Party,

v.

Richard D. Carlson and Dale Summy,

Respondents.

HUDALJ 08-91-0077-1
Decided:  June 12 , 1995

Joseph H. Reed, Esquire
      For Respondent Carlson

Thomas W. Clayton, Esquire
      For Respondent Summy

Dorothy Crow-Willard, Esquire
      For the Government

Before:  Constance T. O'Bryant
      Administrative Law Judge

## INITIAL DECISION ON REMAND

### Statement of the Case

      This matter arose as a result of a complaint filed by James O. and Deplores Bad Horse and Christina Antelope Bad Horse (minor child), ("Complainants") alleging discrimination based on national origin and familial status in violation of the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq.* ("the Act").  On April 29, 1994, following an investigation and a determination that reasonable cause existed to believe that discrimination had occurred, the Department of Housing and Urban Development ("HUD" or "the Charging Party") issued a "Charge of Discrimination" ("Charge") against Richard D. Carlson and Dale Summy ("Respondents") alleging that they had engaged in discriminatory practices in violation of 42 U.S.C. § 3604 (a), (b) and (c).

      Respondents filed a prehearing Motion to Dismiss the Complaint based on alleged delay



2

by the Government in bringing this action. By Order dated July 29, 1994, the Motion was denied. The Motion was renewed at the hearing and again denied in the Initial Decision.

On November 14, 1994, I issued an Initial Decision ("I. D.") dismissing the charges against Respondents, finding that the Charging Party had not proved by a preponderance of the evidence that Respondents had discriminated on the basis of national origin or familial status in violation of 42 U.S.C. § 3604 (a) (b) and (c).

On December 7, 1994, the Secretary of Housing and Urban Development remanded the I. D. to permit consideration of the Charging Party's November 29, 1994, Motion for Reconsideration and any opposition thereto. *See* 24 C.F.R. § 104.932 (a) and (d).

The Charging Party moves for reconsideration pursuant to 24 C.F.R. § 104.450 (a) (1991) of that portion of the I. D. that found no violation of 42 U.S.C. § 3604 (a) (b) and (c) and requests assessment of damages against Respondents. HUD seeks $1,608 in out-of-pocket expenses and $22,000 in total damages. It also seeks a civil penalty of $5,000 against Respondent Carlson and a civil penalty of $250 against Respondent Summy.

Respondents filed a brief opposing the Motion for Reconsideration arguing that the I. D. was well reasoned and contains no clear error, and accordingly, that the determination should not be modified.

The Charging Party cites several alleged errors in the Initial Decision. They argue that the I. D. erred: (1) by failing to impute Mr. Summy's knowledge of Ms. Madrid's discriminatory motivation against the Complainants as Native Americans to his principal, Mr. Carlson; (2) by failing to analyze all direct evidence which they allege required a finding of discrimination; (3) by not finding that Respondents' occupancy policy injured Complainants; and (4) by failing to consider whether Respondents' statement of preference was in violation of the Act independent of the extent to which it injured the Complainants.

Having considered the arguments presented by the parties, I conclude that there is merit to the Charging Party's arguments 3 and 4 above, and that the I. D. should be reconsidered. Accordingly, the Charging Party's Motion will be granted.

3

After reconsideration of the evidence and arguments, I find that the Charging Party has failed to prove by a preponderance of the evidence that Respondents intentionally discriminated against Complainants based on their national origin or on the basis of their familial status. However, I find that the Charging Party has proved by a preponderance of the evidence that Respondents enforced an occupancy standard which had a disparate impact on families with children, specifically on Complainants, in violation of the Act. Further, I find that the Respondent Carlson made a statement with respect to the rental of a dwelling that violated § 3604 (c). Accordingly, I have assessed damages and awarded civil penalties and provided injunctive relief.

**Findings of Fact**[1]

1. Richard D. Carlson, a resident of Houston, Texas, owned rental property in Sioux Falls, South Dakota. The property consisted of two rental units - a downstairs apartment at #1311 South Duluth Avenue, and an upstairs apartment #1311-1/2 South Duluth Avenue. He acquired the property in 1975 and lived for the next two years in the downstairs unit. In 1977, while working for a Legal Aid group, he and his family moved onto an Indian Reservation in Missions, South Dakota. He made Native American friends during the two years that he worked and lived there. Later he took a job as a postal inspector and moved to Houston, Texas. He has rented the upstairs unit since 1975 and the downstairs unit since 1979. In 1993 he sold the property in question and no longer owns rental property. (TR. 25, 263, 289, 431-33, RC's Answer #8).[2]

2. Dale Summy, a 77 year old resident of Sioux Falls, and a former renter from Mr. Carlson, has been on social security disability since 1973 due to a fused right leg that is 1-3/4 inches shorter than his left. He assisted Mr. Carlson in managing his Sioux Falls rental properties for several years, including October 1990; however, there was never a formal employment agreement between them. Mr. Summy's duties included showing the units for rental to prospective renters, communicating with prospective renters concerning the terms and conditions of tenancy, and signing leases for rental on behalf of Respondent Carlson. (TR. 289, 429, 471-473; Summy's Answers #9 and 10 of 5/29/94).

3. In early October 1990, Mr. and Mrs. Bad Horse and their daughter Christina moved to Sioux Falls, South Dakota. Upon arriving in Sioux Falls they saw an ad in the local newspaper, the Argus Leader, for a two-bedroom unit (the 1311-1/2 South Duluth Avenue property). (TR. 68-69). They called the listed number and spoke to Mr. Summy about possibly renting the place. (TR. 69, 144, 204).

4. On October 3, 1990, the Bad Horses met with Mr. Summy who showed them the apartment unit at 1311-1/2 South Duluth Avenue. The unit had a total of 670 square feet of living space.

[1]The Findings of Fact have been modified and supplemented to reflect the decision after reconsideration.

[2]The following reference abbreviations are used in this decision: "TR" for "Transcript;" "GX" for "Government's exhibit;" "RCX" for "Respondent Carlson's exhibit;" "RSX" for "Respondent Summy's exhibit;" "Stip." for "Stipulation by the parties;" "G's Motion" for Government's (Charging Party's) Motion for Reconsideration and Memorandum of Points and Authorities; "RC's Response" for Respondent Carlson's response to the G's Motion; "RS' Response" for Respondent Summy's response to the G's Motion; and "G's Reply" for the Government's reply to Respondents' response to the Motion.

4

(GX-1). One of the two bedrooms had been fashioned out of a sunroom[3]. The bedrooms covered 118 square feet and 114 square feet, respectively. The Bad Horses found it to be comfortable, affordable, quiet and convenient to Mr. Bad Horses' job, to shopping, and to the hospital where Mr. Bad Horse's mother resided. (TR. 69, 144, 204).

5. The lease agreement called for a deposit and payment of the first month's rent. (GX-3). Mr. Bad Horse had limited funds and did not have the full amount for payment of the deposit plus the first month's rent. Mr. Summy nevertheless agreed to allow them to move in with a partial payment. Instead of paying $450 up front ($100 security deposit and first month's rent of $350), Mr. Bad Horse was allowed to pay $275, with an agreement to pay the remaining amount of $175 in two weeks. (TR. 69-72, 133-36, 156, 220, 474-475, 482).

6. When Mr. Summy agreed to rent the unit to the Bad Horses he knew that they were Native American. He also knew that they were a family and that a young child would reside in the apartment. (TR. 468, 475-476).

7. On October 3, 1990, Mr. Summy called Mr. Carlson in Texas and informed him that he had signed a lease agreement with the Bad Horse family. (RCX-5).
Mr. Summy told Mr. Carlson that the Bad Horse family consisted of Mr. Bad Horse, his wife and a child who would be moving into the property. (TR. 475-76). Mr. Carlson agreed to the lease. (GX-11; TR. 433, 476). At the time Mr. Carlson approved the lease he knew that the Bad Horse family were Native American. (TR. 433, GX-13). Also, at the time Mr. Carlson approved the lease he understood that there would be three family members living in the apartment unit -- Mr. Bad Horse, his wife, and the small child.[4] (TR. 475-76).

8. On October 3, 1990, near night time, the Bad Horses moved into the apartment unit at 1311-1/2 South Duluth Avenue. (TR. 67, 71, 475). The apartment on the first floor of 1311 South Duluth was rented out to two persons - Brenda Madrid and her friend, Jeff Olson. During the time the Bad Horses moved in, Brenda Madrid was on the premises and observed the move. (RCX-4)

---

[3]Mr. Bad Horse described it as a "porch", but said it was made into a bedroom that was a good size ... big enough for a little girl. (Stip. p.4)

[4]The factual allegations in the Determination of Reasonable Cause and Charge of Discrimination ("Charge") suggests a different chronology. According to the allegations, Mr. Summy entered into a lease with Complainants and allowed them to move in *before* he informed Mr. Carlson that he had rented the unit to Complainants. That Mr. Carlson, upon learning of the rental to the Bad Horse family, directed
Mr. Summy to ask them to move out because he did not like their "kind." *Charge, ¶¶14 -18*. I do not credit this chronology, but find that Mr. Carlson approved the lease before the Bad Horses were allowed to move in, and that at the time he approved the lease he knew they were Native American and a family of three. This is based on the statement of Mr. Carlson in January, 1991 (GX-11), the trial testimony of both Respondents, and the records of telephone calls made between Mr. Summy and Mr. Carlson on and after October 3, 1990. The telephone records show a call to Mr. Carlson from Mr. Summy at 5:28 p.m. on October 3, 1990 lasting 20 minutes (RCX-5); a call from Ms. Madrid to Mr. Carlson at 7:40 p.m. returned by Mr. Carlson at 8:36 p.m., and then a subsequent call by Mr. Carlson to Mr. Summy at 9:18 p.m. It would appear that the Bad Horses moved in between 5:28 p.m. and 7:40 p.m. According to Mr. Bad Horse it was at night (Stip. p.4) and Ms. Madrid's call was made at 7:40 p.m. (RCX-2, 5). The records reflect no call to Mr. Carlson by Mr. Summy *after* the Complainants moved in.



5

9. Mr. Bad Horse hired a man to help him move. (TR. 102). While helping the Bad Horses to move, the hired helper stated in response to questions from Ms. Madrid that there would be up to 10 people moving into the apartment with the Bad Horses. This statement upset Ms. Madrid. (RCX-4; TR. 68, 102, 142, 143, 222-223, 434, 438-439).

10. During the time the Bad Horses were moving in, Brenda Madrid complained a lot. She specifically complained that they would use too much hot water, stating that the two units shared the same hot water heater and that there would not be enough hot water for her with so many of them upstairs. She also complained that she would have to pay the heating bill. (RCX-4; Stip. - - Mr. Bad Horses' statement to Mr. Burke; TR. 103, 223, 227, 434, 438-439).

11. On October 3, 1990, Brenda Madrid called Mr. Carlson in Texas. (RCX-4, 5; TR. 433-34). Mr. Carlson was not home, so she left a message on his answering machine to return her call. He returned her call. Their conversation lasted 20 minutes. (RCX-5; TR. 461)  She was very angry -- "breathing fire" as he described her. (TR. 434). She stated that the Bad Horses had damaged the property while moving in -- they had damaged the lawn, trampled flowers, broken the front door and damaged a front foyer table. She was also very upset because she had been told that there would be up to 10 people living in that upstairs property, including 4-5 adults and 2-3 children. She didn't know how many people would be living there and complained that there would not be enough hot water for her downstairs if so many people lived upstairs. (TR. 438-439; 476).  She told Mr. Carlson that either he tell the Bad Horses to move or she would move. (TR. 438-440).

12. Ms. Madrid had never called Mr. Carlson to complain about any tenant before. Mr. Carlson considered her a "very good tenant." Her complaints about trampled flowers and lawn damage made immediate sense to him because he was aware

6

that she had planted flowers in the front yard, had fertilized the lawn, and made other improvements in the house. (TR. 435-38).

13. Based on Ms. Madrid's complaints and his belief that there would be continuous conflict between the two tenants and that there would be at least four persons moving into the unit instead of the three persons that he agreed to, Mr. Carlson decided that he would resolve his dilemma by asking the Bad Horses to move. (GX-11; TR. 272, 275, 280, 284, 440-43).

14. On that same evening (October 3, 1990), Mr. Carlson called Mr. Summy (RCX-5; TR. 440). In that conversation Mr. Carlson directed Mr. Summy to ask the Bad Horses to move. He hoped that they would be willing to leave upon his request. (TR. 458). During his 15 years as a landlord, Mr. Carlson's usual practice for dealing with problems involving his tenants was to ask them to leave. They had always complied. He had never had occasion to go through the process of evicting anyone. (TR. 431-32).

15. The Bad Horses spent the night at the apartment unit at 1311-1/2 South Duluth Avenue. (TR. 75-86). Early the following morning, on October 4, 1990,
Mr. Summy went to the Bad Horses with the "bad news" and told them that Mr. Carlson thought that it would be better if they found a different accommodations, (TR. 96, 476-77) and asked if they would move. (GX-14; 96, 272, 275, 440, 476-77). In delivering the message, Mr. Summy was apologetic, not hostile or threatening of forceful eviction.[5]
Mr. Bad Horse seemed a "little bit surprised" but did not raise his voice to Mr. Summy, nor did he appeal to Mr. Summy to try to get Mr. Carlson to change his mind. He simply said "well, so be it." (TR. 479-480). The Bad Horses decided to comply because they felt they had no good alternative (TR. 76-77), and because they "thought that it would be the best thing for everybody right then and there." (RSX-1). As permitted by Mr. Carlson, Mr. Summy told them they could stay on at 1311-1/2 South Duluth until they could find another place. (TR.78, 443, GX-14).[6]

16. The Bad Horses moved on October 13, 1990, to an apartment in a complex some three miles away. (TR. 99).

17. When the Bad Horses moved to Sioux Falls they had wanted to rent at an apartment complex, one with a washer and dryer. However, Mr. Bad Horse didn't have the amount of money that was needed to rent at an apartment complex. He had only $275, which is why he made the arrangement with Mr. Summy to rent at 1311-1/2 South Duluth Ave. By October 13, he had received a paycheck and could afford to move to an apartment complex. The new apartment had a washer and dryer, both conveniences desired by Complainants. (TR. 133-146).

18. During the period between October 4 and October 13, Ms. Madrid "was chronically

---

[5]The Charging Part asserts that Mr. Carlson's action was tantamount to an "eviction." Respondents never took or threatened to take legal action against Complainants. The preponderance of the evidence shows that the Bad Horses were asked to leave. and they complied. (TR. 272. 275, 440). This is consistent with the allegation in the *Charge*, (see ¶17) and in other prehearing documents (see Pre-Hearing Statement. B. Facts Stipulated by the Parties #3).

[6]Mr. Carlson testified that he knew the Bad Horses were going to be inconvenienced in having to move out and to find new accommodations, so he thought it "only reasonable on my part to allow them adequate time to find another place." (TR. 443).



complaining about everything." (TR. 144). When Mr. Bad Horse turned in the keys to Mr. Summy on October 13, 1990, he thanked Mr. Summy and told him that Mr. Carlson had done him a favor by letting him leave without honoring the lease -- that he was glad to get away from the neighbor downstairs. (TR. 117, 482).[7]

19. Within weeks after the Bad Horses moved out of 1311-1/2 South Duluth Avenue, the Respondents rented the unit to George and Colleen Donnell, a Native American couple with two children under the age of 18. They resided in the upstairs unit during the month of November 1990, and then moved downstairs in December 1990, where they stayed until May, 1992. (TR. 166-67; 180; 187; 483, GX-10).

20. During the period between October 4, 1990, and December 21, 1990, Mr. Bad Horse discussed what had happened to him with his supervisor at work. His supervisor questioned how he could "let them do that to" him. It was then that Mr. Bad Horse decided to file a complaint. (TR. 101). On December 21, 1990, the Bad Horses met with Mr. Thomas Burke of the Sioux Falls Human Rights Commission and filed a complaint alleging discrimination based on national origin. (GX-4, TR. 97). Although Mr. Bad Horse was aware that it was unlawful to discriminate against families with children, he related no facts to Mr. Burke which supported a complaint of discrimination based on familial status. (TR. 144).

21. When Mr. Carlson was notified of the complaint filed by the Bad Horses alleging discrimination based on their being Native Americans, he was "shocked' and deeply embarrassed. He had never before been accused of discrimination. (TR. 444-45.)
22. By letter dated January 8, 1991, Mr. Carlson responded to the charge. He denied ever discriminating against anyone on the basis of race or national origin, stating that he had known that the Bad Horses were Native Americans when he rented to them and that had he not wanted to rent to them, he would not have done so. He gave as his reason for asking them to move the conflict that had developed with the tenant downstairs, Ms. Brenda Madrid, and the fact that there were four people moving in with the Bad Horse family instead of the three they had agreed to.

---

[7]According to Mr. Summy, whose testimony I credit, Mr. Bad Horse stated that he was glad to get away from "the blister (substituted by Mr. Summy for another b---- word) downstairs." (TR. 482).

8

23. In his letter of January 8, 1991, Mr. Carlson made the statement, *inter alia,* that his instructions to Mr. Summy was to rent the apartment "to a single person or at the most a married couple/two single persons." (GX-11).

24. After considering the statements by Mr. Carlson in his letter, Mr. Burke informed the Bad Horses that there was grounds to file a complaint of discrimination on the basis of familial status. (TR. 97). On January 22, 1991, the Bad Horses executed an amended complaint showing discrimination based on national origin and familial status. (GX-8).

25. On March 6, 1991, Mr. Carlson responded to the amended complaint, which now alleged discrimination based on familial status. He denied that he discriminated against the Complainants based on their being a family with a child. He stated that it made no difference to him whether the four people moving into the apartment were all adults, all children or any combination there of. He did not want four people living in the apartment. He stated that he was aware before the Bad Horses moved in that they had one child and if he had not wanted them to live there because they had a child he would not have allowed them to move in. (GX-13)

26. Mr. Carlson had previously rented the upstairs unit to Native Americans (GX-14, TR. 432). The tenants immediately preceding the Bad Horses were two Native American women who left because of nonpayment of rent, with no indication of other problems.

27. Neither Mr. Summy or Mr. Carlson knew at the time Mr. Carlson instructed Mr. Summy to ask the Bad Horses to leave, that Ms. Madrid had a bias against Native Americans, or that her bias motivated her complaints.

28. Mr. Carlson had an informal policy which preferred limiting rental of the upstairs unit to two persons. The policy as applied allowed the rental of the unit to a married couple, two single individuals, or a parent and a minor child. He made an exception to the policy to rent to the Bad Horse family of three. He had rented to three persons in the past. When Mr. Carlson made an exception to allow rental to three persons, he didn't care whether one or two of the three persons were children. (GX-13; RS' Answer to Charge, ¶22).

29. Respondents had rented to families on many occasions. In the four-year period from July 1986 to July 1990, three of the four tenants who resided at 1311 and 1311-1/2 South Duluth Avenue were families consisting of at least one parent and one minor child, with one family with two minor children. (GX-11, GX-14, TR. 431-32). Neither Mr. Summy nor Mr. Carlson had ever turned down any applicant for rental because the household included a child. (TR. 431, 445).

## The Charging Party's Theories of Discrimination

The Charging Party alleges in the Determination of Reasonable Cause and the Charge of Discrimination that Respondents, directly or through an agent, discriminated against Complainants on the basis of national origin in violation of 42 U.S.C. § 3604 (a) and (b) by: (1) requesting and/or requiring Complainants to move out of their rented unit, and (2) by "stating that the owner did not rent to 'your kind' of people and (stating) that the owner had had problems with Native Americans in the past." In its post-hearing briefs, the Charging Party advanced an



alternate theory of intentional discrimination. It argued that Respondents knowingly and intentionally discriminated against Complainants when they asked them to move based on complaints by Brenda Madrid knowing that her complaints were motivated by bias against Native Americans. In this regard, the Charging Party asserts that Respondent Summy had knowledge of Ms. Madrid's motivation, and that as Respondent Carlson's agent, his knowledge must be imputed to Respondent Carlson.

With regard to the charge of familial status violations under 42 U.S.C. § 3604 (a) and (b), the Charging Party has advanced both "disparate treatment" and "disparate impact" analyses. They argue in support of the disparate treatment analysis that Respondent used complaints made by Ms. Madrid as a pretext to discriminate against Complainants because they were a family with a child. In addition, they argue that certain statements made by Respondents in letters to Mr. Burke of the Sioux Falls Human Rights Commission directly evidence intentional discrimination. Further, they argue that Respondent Carlson's alleged policy of preference in renting to a single person, or, at most, to a couple or two single persons is proof of his dispreference for families; and that in asking the Bad Horses to move, Respondent enforced an occupancy standard which had a disparate impact on families with children and a discriminatory effect on the Complainants.

The Respondents' Explanation

Respondents deny that national origin or familial status considerations played any part in their request that Complainants vacate the apartment at 1311-1/2 South Duluth Avenue. They assert that they rented to Native Americans and to families before and after Complainants. They assert, further, that they had a legitimate non-discriminatory reason for their actions. According to Respondents, the reason Mr. and Mrs. Bad Horse and child were asked to leave the apartment Respondents had just leased to them was due to problems that quickly developed between the Bad Horses and the downstairs neighbor, Brenda Madrid. Respondents assert that Mr. Carlson acted to resolve an immediately acrimonious tenant-to-tenant dispute, and did so without regard to race, national origin or familial status. On the basis of complaints from Ms. Madrid, Respondent Carlson had reason to believe that the Complainants had damaged the property and that they intended to move in more persons than he had approved.
Mr. Carlson concluded that immediate response on his part was required in order to quickly resolve the matter. To this end he asked the Bad Horses to leave, and they complied. (Respondent Carlson's Brief, pp. 11-13; Respondent Summy's Brief pp. 7-8).

Subsidiary Findings and Discussion

<u>Legal Framework</u>

The Congress passed the Fair Housing Act to "[e]nsure the removal of artificial, arbitrary, and unnecessary barriers when the barriers operate invidiously to discriminate on the basis of impermissible characteristics." *United States v. Parma*, 494 F. Supp. 1049, 1053 (N.D. Ohio 1980), *rev'd on other grounds*, 661 F.2d 562 (6th Cir. 1981), *cert. denied*, 465 U.S. 926 (1982). *See also United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042 (1975); *cf. Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). The Act was designed to prohibit "all forms of discrimination [even the] simple-minded." *Williams v. Matthews Co.*, 499 F.2d 819, 826 (8th Cir.) *cert. denied*, 419 U.S 1027 (1974).

10

  The Act makes it unlawful for anyone to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race...." 42 U.S.C. § 3604(a).  Furthermore, the Act prohibits a housing provider from "discriminat[ing] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race...." 42 U.S.C. §3604(b).

  Special methods have been devised to analyze the proof adduced in cases alleging violations of civil rights.  The framework to be applied in a case under the Fair Housing Act depends on whether the evidence offered to prove the alleged violation is direct or indirect. Direct evidence, if it constitutes a preponderance of the evidence as a whole, will support a finding of discrimination.  *See Pinchback v. Armistead Homes Corp.,* 907 F.2d 1447, 1452 (4th Cir.) *cert. denied,* 498 U.S. 983 (1990).  However, in the absence of direct evidence of discrimination, the analytical framework to be applied in a fair housing case is the same as the three-part test used in employment discrimination cases under Title VII of the Civil Rights Act as set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  *See HUD v. Blackwell,* 908 F.2d 864, 870 (11th Cir. 1990); *Pinchback,* 907 F.2d at 1451.  Under that test:

> First, the plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence....  Second, if the plaintiff sufficiently establishes a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action....  Third, if the defendant satisfies this burden, the plaintiff has the opportunity to prove by a preponderance [of the evidence] that the legitimate reasons asserted by the defendant are in fact mere pretext.

*Pollitt v. Bramel,* 669 F.Supp. 172, 175 (S.D. Ohio 1987); *see also McDonnell Douglas,* 411 U.S. at 802, 804.  The shifting burdens analysis in *McDonnell Douglas* is designed to ensure that a complainant has his or her day in court despite the absence of any direct evidence of discrimination.  *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, (1984) (citing *Teamsters v. United States,* 431 U.S. 324, 358 n. 44 (1977)).

  Direct evidence establishes a proposition directly rather than inferentially.[8]  The Charging Party contends that there is direct evidence of discrimination in this case, both as to national origin and as to familial status.  If such evidence is present, and is established by a preponderance of the credible evidence, it is sufficient to support a finding of discrimination. For the reasons discussed below, I find that the direct evidence in this case does not establish discrimination.

Disparate Treatment

A.  National Origin -- Impute Theory:

  Mr. Summy testified that Ms. Madrid made statements to him indicating a bias against

---

[8]For examples of direct evidence of discriminatory intent, see *Pinchback v. Armistead Homes Corp.,* 907 F. 2d 1447 (4th Cir. 1990), *cert. denied,* 111 S. Ct. 515 (1990).

11

Native Americans. (TR. 298).   According to his testimony, she said that "she had trouble with these kind of people" (meaning Native Americans) and "had moved to Sioux Falls expecting never to be bothered by them." (TR. 298-300). The Charging Party contends that these statements and the fact that the evidence shows that the property was not as severely damages as Ms. Madrid claimed, show that Ms. Madrid was motivated by racial animus when she lodged complaints against the Bad Horses. The Charging Party contends that "the most logical inference is that Ms. Madrid lied to Respondent Carlson about the nature and extent of the damage the Bad Horses actually had caused," and that she did so because she was prejudiced against Native Americans G's Motion at pp. 23-24). The Charging Party also asserts that Mr. Summy knew of her prejudice and her motivation and that his knowledge must be imputed to Mr. Carlson, his principal.

Case law supports the proposition that complainants may prove discrimination by showing that respondents acted in response to the discriminatory wishes of a third party. *See Cato v. Jalik*, 779 F. Supp 937 (N. D. Ill. 1991). *See also Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1531 (7th Cir. 1990); and *Peoples Helpers, Inc. v. City of Richmond*, FH - FL ¶15,755 (E.D. Va. 4-13-92). However, I held in the I. D. that the Charging Party had failed to prove knowledge by either Mr. Summy or Mr. Carlson of Ms. Madrid's unlawful motivation. After reconsideration, I find no reason to modify the I. D. in this regard.

The facts in this case are distinguishable from those in *Cato*, the case relied upon by the Charging Party. In that case the respondent admitted that he rejected the African American applicant based on comments made by another tenant to him and whose comments the respondent knew to be racially motivated. Similarly, in *Peoples Helpers*, the City of Richmond admitted that they were well aware of the discriminatory motives behind the complaints of the neighbors. In the Memorandum opinion denying the City's Motion for Summary Judgment, the court stated that liability is established if complainants show that respondents acted for the sole purpose of effectuating the desires of the neighbors, that racial or other unlawful considerations were a motivating factor behind the desires of the neighbors, and that respondents were aware of their motivation. *Id. at 16,931.*

The Charging Party acknowledges that it is not clear based on the evidence of record when Ms. Madrid made the statement to Mr. Summy. (G's Motion at p. 24, n.14). Mr. Summy's deposition testimony was that "one day" Ms. Madrid told him this. (TR. 300). However, based on other testimony by Mr. Summy at the hearing, the Charging Party states that his testimony "*suggests*" that the statement was made by Ms. Madrid "contemporaneously with her complaint to Respondent Summy about the Bad Horses' breaking a flower pot or vase." (*Id.* at pp. 24 and 27). Although the Charging Party infers from his testimony that her comment was made on the day the bad Horses moved in,[9] Mr. Summy's testimony is that the complaints about the flower

---

[9]The Charging Party states that "Respondent Summy's testimony *suggests* that she specifically directed her statement of bias and moving to Sioux Falls to get away from Native Americans at the Bad Horses." To reach that conclusion required drawing an inference upon an inference. At footnote 14, the Charging Party states:

"...Since Respondent Summy's response to Ms. Madrid's statement of bias, Tr. 300, and to Ms. Madrid's complaints about her new Native American neighbors, Tr. 477, was the same, and since it appears that he made that response to Ms. Madrid only once, it is reasonable to infer that Ms. Madrid's statement of prejudice was made the day the Bad Horses moved in, and she directed it specifically at them."

12

pot or vase were made to him on the morning of October 4, 1990, the day after Mr. Carlson directed him to ask the Bad Horses to move. (TR. 298). Furthermore, Respondent Carlson credibly testified that his direction to Mr. Summy was not motivated by racial animus. In short, the preponderance of the evidence does not show that Respondent Summy had knowledge of Ms. Madrid's attitude toward Native Americans on October 3, 1990.

B.  Familial Status:

In the I. D., I held that the Charging Party had failed to prove by a preponderance of the evidence that Respondents discriminated against Complainants on the basis of familial status. I reasoned that the evidence established that the Respondents rented to Complainants knowing that they were a couple with a 5-year old child; that Respondents rented to them even though they had a legitimate basis for declining to rent to them were they so inclined (Complainants did not have enough money to pay the required deposit and first month's rent);[16] and that they rented to families with children both before and after the Bad Horses. (I. D. at 16-17, 20). I stated that "[b]ut for the complaints that were lodged with Mr. Carlson by Ms. Madrid, there is reason to believe that this family of three would have been allowed to reside in the unit indefinitely. The Respondents' action in renting the unit to a family of four within weeks thereafter suggests the same." (I. D. at 16).

The Charging Party contends that implicit in that "but-for" rationale is the application of a legal principle that Complainants were required to establish that the only reason for Respondents' adverse actions against the Bad Horses was discrimination. The Charging Party cites a number of cases and asserts that to prevail the Complainants need only show that Ms. Madrid's discriminatory animus was one of the factors that motivated the eviction of the Bad Horses, and argues that had the correct principle been applied, a different result would have been compelled. This argument has no merit. I did not conclude in the I. D. that this is a mixed motive case. I found no unlawful motivation on the part of the Respondents.

The Charging Party also argues that certain statements made by Respondents in their response to the original complaint (characterized as admissions) compel the conclusion that Respondents discriminated against Complainants on the basis of their familial status. That argument has no merit.

To prove disparate treatment of Complainants by Respondents on the basis of familial status, the Charging Party relies exclusively on selected statements by Respondents in letters to

---

[16]The Charging Party incorrectly argues that there is no evidence that a deposit was required. The written contract signed by the Bad Horses calls for agreement to pay, in addition to monthly payment, an amount "to be returned at termination of this tenancy, provided 2 keys to said property are returned to agent, premises is left in acceptable condition and said tenant, ... has caused no damage to property ... and owes no rents or penalties to said agent." (GX-3). Although there is no provision specifically designated "security deposit", the terms and condition can reasonably be considered a requirement for a security deposit. Mr. Summy testified that once the applicant showed interest in the apartment, he would show them a copy of the lease and explain the contents to them. (TR. 294). This was the same contract that Mr. Summy required the Donnells to sign. The Donnells paid a deposit (GX-10) as did the tenants who immediately preceded the Bad Horses. (TR. 269). Moreover, Mr. Bad Horse, himself, testified that he did not have money for the deposit and full first month's rent and that Mr. Summy allowed him to move in with a promise to pay the balance in two weeks. (TR. 156). Finally, Mr. Summy testified to returning $100 as "refund of the deposit" to Mr. Bad Horse when he turned in the keys. (TR.479-480).

13

Mr. Burke of the Sioux Falls Human Rights Commission responding to a complaint alleging discrimination based on national origin.[11] These statements include: (1) a statement from Mr. Summy's answer to the initial complaint, in which he gives as the reason the Bad Horses were asked to move that "Mr. Carlson directed me to ask Mr. Bad Horse to leave because Mr. Carlson wanted the apartment rented preferably to a single person." (GX-14); (2) Mr. Summy's hearing testimony confirming that Respondent Carlson had directed him to rent the unit "preferably to single persons" (TR. 290); and (3) Respondent Carlson's statements in his January 9, 1991, letter to Mr. Burke in answer to the original complaint, that [t]he instructions to Mr. Summy was [sic] to rent the apartment to "a single person or at the most a married couple/two single persons;" that he "had had problems in the past with families moving out;" that the unit was "too small for a family;" and that between mid-October and December 15, 1990, the apartment could have been rented to families but was not." (GX-11). Taken together, they form the basis of the Charging Party's assertion that Respondent Carlson had a policy that preferred renting to adults only and against renting to families with children, and that pursuant to that policy, Respondent Carlson directed Mr. Summy to ask the Bad Horses to move because they were a family with children.

Taken at face value, these statements indicate discriminatory animus, but when viewed in context and considered with the other evidence of record, they do not compel a finding that Respondents asked the Bad Horses to leave because they were a family. Mr. Carlson denied that he had a policy that preferred renting to adults only. He asserts that the statement of his instruction to Mr. Summy is not a full an accurate description of his instructions and that when accurately stated it would include rental to a two-person family, i.e. a parent and a child. I credit Respondent's testimony that the statements cited above did not accurately reflect his instructions

---

[11]In the I. D. I found Mr. Bad Horse's testimony incredible that he filed the Amended Charge alleging familial status discrimination because one reason Mr. Summy gave for requiring them to move was because they had a child. The Charging Party asserts that Mr. Bad Horse did not testify that Mr. Summy *orally* told him that he was being asked to move because they were a couple with a child. I find no merit to that contention.

Mr. Bad Horse's testified as follows (TR. 118-19):
    Q. Now, did Mr. Summy ever tell you, either on his own behalf or on Mr. Carlson's behalf, that you should move because on (sic) the basis of your family?
    A. Yes, because of the family size. We were told that.
    Q. By who, told by who?
    A. Mr. Summy had said Mr. Carlson wanted the place rented to two singles, a couple, at most he said maybe a parent and a child.
    Q. And when did he say that to you?
    A. That was after we were evicted out.
    Q. After you were evicted out. When was that?
    A. Which was the 4th of October. (Tr. 118-19).

While still testifying on the subject of the familial status claim, Mr. Bad Horse testified as follows:
                  ***            Q. So it's a statement from Mrs. Madrid that was the basis of your family status discrimination complaint, wasn't it?
    A. No.
    Q. Then whose was it?
    A. I was told by Mr. Summy *that morning* for the reason why I had to leave.... (TR. 121).

14

to Mr. Summy. The weight of the evidence supports finding that Mr Carlson had a policy that preferred renting to two persons, regardless of relationship.

Mr. Carlson's statements, when viewed in context, show that in instructing Mr. Summy, his concern was about the number of people rented to. He stated:

> The instructions to Mr. Summy [was] to rent the apartment to a single person or at the most a married couple/two single persons. I have rented the apartment to families with 1 child on a couple of previous occasions and without exception the family moved out as soon as possible because in their words, 'The apartment is to [sic] small for a family'.

> So when Dale Summy called me in October and told me he had rented the apartment to a married couple with a child I was upset. He assured me they appeared to be a good family and that they were desperate for an apartment. It was with reluctance that I agreed with them moving in because I knew it would not be long before the apartment would not be large enough.

Thus, although these statements are relied upon by the Charging Party to prove a policy of rental to adults only, they also provide some support for Mr. Carlson's claim that he was concerned with the number of persons rented to, not with familial status. The letter shows that Mr. Carlson's stated reason for his instructions was that "families with 1 child" found his unit "too small." The clear indication is his concern that the unit was too small for three people. This is consistent with his testimony that renters found the unit too small for "three people." (TR. 446). When Mr. Carlson applied an exception in this case and rented to the Bad Horses, his reluctance went to the fact that there were three persons in the family, not to the fact that the family included a child.

However, even conceding that Mr. Carlson had a policy that preferred rental to adults only, as alleged, it is his actions and motivation in this case that are critical to the evaluation of his motivation in asking the Bad Horse family to move. In this case, it is clear that in spite of the policy, he rented to the Bad Horses -- a family of two adults and a child. The issue is Mr. Carlson's reason for asking the Bad Horses to move. Mr. Carlson addressed that issue in his January 18, 1991, letter. He discussed developments relating to the complaints from Ms. Madrid that occurred after he made his decision to rent to the Bad Horses and stated:

> With the information that there were in fact four persons living in the apartment and that it was obvious there was going to be constant conflict between upstairs/downstairs neighbors I decided it was necessary for the Bad Horses to move. (GX-11).

In his letter of March 2, 1991, to Mr. Burke in response to the complaint of familial status, Mr. Carlson reiterated that he asked the Bad Horses to leave because he did not want four people living in the unit and because of the animosity that developed between the upstairs and downstairs tenants. He denied asking Complainants to leave because they were a family with a child, stating that it did not make a difference to him whether the four people moving into the apartment were all adults or a mix of adult and children. He asserted that if he had not wanted the Bad Horses to live in the apartment because they had a child, he would not have rented to



15

them in the first place.  (GX-13).

The only evidence which directly contradicts Mr. Carlson's reasons for asking the Complainants to move is Mr. Summy's statement that Mr. Carlson asked them to move because he wanted the unit rented to "a single person."  (GX-14).  Rental to a single person would, of course, preclude rental to a family.  However, I do not credit this statement.  There is no other support in the evidence for the contention that Mr. Carlson wanted to rent the unit to one person.  The rental history going back nearly five years consistently shows rental to at least two people.

Further, the Charging Party has cited to a portion of a paragraph from Mr. Summy's letter.  It is important to consider the statement in full context.  The paragraph reads:

> It has been in compliance with the owner's wishes that the rental of the apartment at 1311-1/2 S. Duluth Avenue, Sioux Falls, SD, should be to single persons.  This apartment has been rented in the past to single couples with no children and to a single parent with one child.  I made an exception to the owner's policy, without his knowledge, to allow Mr. Bad Horse to rent the apartment with his wife and one approximately 3 year old child.  Upon notification of Mr. Carlson that the apartment was rented to a couple with one child, <u>Mr. Carlson directed me to ask Mr. Bad Horse to leave because Mr. Carlson wanted the apartment rented preferably to a single person</u>. (emphasis added in Charging Party's Motion).  (See GX-14).

When the underlined statement is viewed in the context of the entire paragraph, it can be seen that the statement is both inaccurate and ambiguous.  Mr. Summy's statement that he made an exception to Mr. Carlson's policy and rented to the Bad Horses, without Mr. Carlson's knowledge, is contrary to all the other evidence in the case, including Mr. Summy's own testimony.  (See also n.4).  This inaccuracy seriously undermines the reliability of Mr. Summy's further statement that "[u]pon notification of Mr. Carlson that the apartment was rented to a couple with one child, Mr. Carlson directed me to ask Mr. Bad Horse to leave because Mr. Carlson wanted the apartment rented preferably to a single person."  Further, the first sentence of the paragraph of the paragraph quoted above describes "the owner's wishes" that the apartment should be rented to single persons.  In describing the single persons rented to in the past, the statement includes a single couple with no children and "a single parent and one child."  This statement shows that rental to a parent and child couple complied with the owner's wishes and supports Mr. Carlson's testimony that he was concerned about the number of persons rented to, not their age or familial status.   The inaccuracies and ambiguities of Mr. Summy's statements regarding Mr. Carlson's action prohibit giving them more than minimal weight.

Moreover, other evidence of record is persuasively contradicts the assertion that Mr. Carlson had a discriminatory animus against children or families with children, and that he asked the Bad Horses to leave because they were a family.  Mr. Carlson credibly testified that he had no problem renting to families with children.  The evidence established that neither Mr. Carlson nor Mr. Summy ever refused to rent the unit to anyone at any time. (TR. 287-88, 431-32).  There is no evidence that Respondents ever expressed a stereotypical view of children or demonstrated evidence of animus against children or families with children.  Respondents never complained to anyone that a child resident was too noisy, or destructive, or posed too great a danger of being hurt on the property, or gave them any reason for concern whatever because of his/her child status.  Mr. Carlson's history of renting at South Duluth Avenue shows that he



16

rented to many families with children. Jan Cavanaugh testified that she and her son lived in the unit rented to the Bad Horses for nearly four years, from late summer 1986 to July 1990. (TR. 195). In 1986 when she moved in, her son was about 4 years old. According to Ms. Cavanaugh, during the four-year period she lived in the upstairs unit, there was a change three times in the tenants who rented downstairs. Two of the three were families, with one family consisting of one parent and two children. Thus, during the four-year period almost immediately preceding Respondents' rental to the Bad Horses, three of the four residents of Respondents units were families with minor children.

Finally, the testimony of Mr. and Mrs. Donnell establishes that Mr. Carlson rented the upstairs unit to the Donnell family of four, including two minor children, from November 1, 1990, to December 1, 1990. Mr. Carlson's inaccurately remembered that between October 13, and December 15, 1990, the unit could have been rented to families but was not. Accordingly, Mr. Carlson's inaccurate memory does not prove that he asked the Bad Horses to leave because they were a family.

In considering what weight to give to the statements by Respondents Carlson and Summy, I find their hearing testimony more reliable. The record suggests that by the time they came to hearing they had a better understanding of the legal definition of "family" and "familial status" than they had at the time they made the statements that facially implicated them with familial status discrimination. The use of the term "family" to some might suggest a husband and a wife and at least one child, i.e. three persons. This is not the regulatory definition. The regulatory definition includes a two-person family of a parent and one child. See 24 C.F.R. § 100.20.

Having considered the alleged direct and indirect evidence of discriminatory intent, I conclude that the Charging Party has failed to establish that Respondents intentionally discriminated against Complainants on the basis of familial status.

<u>Disparate Impact Analysis</u>

Although I find that the Charging Party has failed to prove by a preponderance of the evidence that Respondents intentionally discriminated against Complainants, I find merit in the Charging Party's alternate contention that the evidence shows discrimination based on "disparate impact." Mr. Carlson stated in his letter March 6, 1991, that he asked the Complainants to move, in part, because he did not want four people living in the unit and that had the Complainants informed him that there would be four occupants he would not have rented to them in the first place. (GX-13). He did not want more than three persons in the unit "under any circumstances." Id. Based on these statements, I find that Mr. Carlson asked Complainants to leave, in part, to enforce a facially neutral occupancy standard which limited rental to a maximum of three persons.[12] That leaves the question whether the three-person maximum occupancy standard had a disparate impact on families with children.

A policy or practice that is neutral on its face may be found to be violative of the Act if the record establishes a *prima facie* case that the policy or practice has a disparate impact on

---

[12]One might argue that preference for two persons rather than three persons should be applied. However, whether the analysis is using a two person occupancy standard or a three person standard, the result is the same.

17

members of a protected class, and the Respondent cannot prove that the policy is justified by business necessity. *HUD v. Mountain Side Mobile Estates v. HUD,* __F.3d_ (10th Cir. 1995).

The Charging Party introduced the 1990 Census of Population and Housing for Sioux Falls data, showing that the average family with children (3.61 persons) is excluded by Respondents' asserted policy or practice limiting rentals to a three-person maximum, whereas the average household without children (1.81 persons) is not excluded by the policy. (GX-15). **The evidence further shows, using national statistics, that approximately 58.8% of families with minor children in Sioux Falls would be prevented from living in Respondent's unit by the practice of limiting occupancy to no more than three people.[13]** In contrast, only about 3.6% of households without minor children in Sioux Falls are prevented from living in the unit by the three-person maximum limit. (GX-16). The Charging Party also produced evidence that under the Sioux Falls Housing Code, the unit rented by Complainants was larger than required for two persons. The unit with two bedrooms of 118 and 114 square feet, respectively, were more than big enough to satisfy the 90 square feet of floor space required for two persons per bedroom. (GX-17). Thus, the evidence shows that Respondent's limitation on the dwelling to no more than three persons was not justified based on the local

---

[13]In *Betsey v. Turtle Creek*, 736 F.2d 983,988 (4th Cir. 1984), it was held that a policy affecting 54.3% of the protected class established disparate impact.

18

housing code.  In short, the Charging Party has established a *prima facie* case of disparate impact based on census statistics and local occupancy standards.

The Respondent has the burden to overcome the *prima facie* case by establishing a business necessity for the policy.  This business necessity must be supported by objective evidence, as opposed to subjective opinion.  *Mountain Side.*  In this regard, the only reason advanced by Mr. Carlson for his policy was his experience that when he had rented to three persons in the past, they became dissatisfied with the apartment because it was too small for them and they soon moved out.[14]  This reason, standing alone, does not provide the type of objective evidence required to meet the business necessity standard, thus, he has not demonstrated a business necessity.  Accordingly, Respondent Carlson's three-person occupancy policy resulted in a disparate impact on families with children and discriminated against Complainants based on their familial status in violation of the Act.  Accordingly, Respondent Carlson's three-person occupancy limit violated § 3604 (b) of the Act.

Statement of Preference

The Secretary has charged that Respondent Carlson had a stated preference for renting the unit in question to "a single person or, at most, to a married couple/two single persons" and that he instructed Mr. Summy to act according to his preference.  In doing so, Mr. Carlson "published, made and/or caused to be made notices or statements indicating a limitation based on familial status" and injured Complainants in violation of 42 U.S.C.A. § 3604 (c).

Section 3604 (c) provides that:

> it shall be unlawful -- (c) to make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make such preference, limitation, or discrimination.  42 U.S.C. § 3604 (c).

In this case, to prove a violation of § 3604 (c), the Complainants must establish by a preponderance of the evidence that Respondents made the alleged statement and that such statement "indicates" discrimination based on familial status.

Respondents' articulation of a preference that is unlawful would constitute a violation of the Act even if it did not cause the Bad Horses an injury.  A violation may be proved without any demonstration that a respondent intended to make an unlawful



---

[14]Mr. Carlson testified that he did not believe he would have lost a great deal of money in his business if he had not asked the Bad Horses to move.  (TR. 270).

19

statement. *See HUD v. Denton*, Fair Housing- Fair Lending ¶25,024 at 25,279. (HUDALJ 1992).

A preference to rent to a "single person, or at most a married couple/two single persons" does not violate the Act, *per se*. Courts usually apply an "ordinary reader" or "ordinary listener" test[15] to determine whether the preference "indicates" discriminatory intent. Here, the evidence of the statement of preference was of an oral statement communicated by Mr. Carlson to Mr. Summy.[16] It was reduced to writing in a letter sent to Mr. Burke. Although Mr. Carlson asserted that the preference as stated in the written correspondence to Mr. Burke is not an accurate reflection of his instructions to Mr. Summy and of his intent, he did not deny making the statement. Applying the "ordinary listener" test, I conclude that to the ordinary listener, each of the phrases -- "a single person", "a married couple" and "two single persons" -- indicates adult persons. Thus, the stated preference limiting rental to persons in these categories "indicates" discrimination based on familial status.

Accordingly, I find that the Charging Party has proved a violation of § 3604 (c). Although I find a violation of § 3604 (c), there has been no showing that the Complainants were damaged as a result of the violation. The statement was not made to them and they did not become aware of it until months after they were asked to leave.

## DAMAGES

The Act provides that where violations are proved, Complainants are entitled to "such relief as may be appropriate, which may include actual damages ... and injunctive or other equitable relief." 42 U.S.C. § 3612 (g) (3). Having found that Respondents' violated §§ 3604 (b) and (c) of the Act, Complainants have suffered injury from Respondents' actions and are entitled to appropriate compensation.

The Charging Party requests $1,608 in economic damages. It also seeks awards of $10,000 each for Mr. Bad Horse and $12,000 for Mrs. Bad Horse in intangible injuries, including damages for embarrassment, humiliation, emotional distress, inconvenience, and loss of housing opportunity caused by the discrimination.

### Out-of-Pocket Expenses

The Bad Horses are entitled to out-of-pocket expenses which were incurred as a result of Respondents' actions. *See, e.g., HUD v. Morgan*, 2 Fair Housing - Fair Lending (P-H) ¶ 25,008, 25, 138 (HUDALJ July 25, 1991), *modified on other grounds*, 985 F.2d 1451 (10th Cir. 1993);

---

[15]The circuits courts that have dealt with the "indicates" aspect of § 3604 (c) have employed a straightforward approach. An objective "ordinary reader" standard should be applied in determining what is "indicated" by an ad or statement. Thus, the statute is violated if an ad for housing or a statement suggests to an ordinary reader that a particular protected group is preferred or dispreferred for the housing. *Ragin v. New York Times Co.*, 923 F. 2d 955 (2d Cir.) *cert. denied* 112 S. Ct. 81 (1991). Although no showing of subjective intent is necessary, evidence of such intent is not irrelevant.

[16]A statement of unlawful preference made by a landlord to his agent can constitute a violation of § 3604 (c) pursuant to 24 C.F.R. § 100.75(b).

20

*HUD v. Blackwell*, FH-FL ¶25,001 at 25,010 (HUDALJ 1989), *aff'd* 908 F.2d 864 (11th Cir.
1990). They are entitled to costs associated with obtaining new housing. *See Hamilton v.
Svatik*, 779 F.2d 383 (7th Cir. 1985), and to recover expenses incurred from expenses related to
their pursuit of this complaint and participation in these proceedings. *See TEMS Ass'n*, 2 Fair
Housing-Fair Lending at 24,311; *HUD v. Murphy*, 2 Fair Housing-Fair Lending (P-H) ¶ 25,002,
25,054 (HUDALJ July 13, 1990). I find that the requested expense are reasonable and that the
Bad Horses are entitled to $1,608 in out-of-pocket losses as a result of being required to move
out of Respondent's apartment. This includes $15 for the cost of the move, $533 in additional
rent at their new apartment where they lived for 4 months and 19 days ($115/month); $450 in
extra travel costs to and from work; $20 for telephone calls and $7.65 in facsimile transmissions
to HUD in connection with the case; $165 for mileage expense to appear at trial; and $417 in
lost wages ($139/day x 3 days) for two days of hearings and two half days of travel.

Emotional Damages

The Complainants are entitled to damages for embarrassment, humiliation, emotional
distress, inconvenience, and loss of housing opportunity caused by the discrimination. *HUD ex
rel. Herron v. Blackwell*, 908 F.2d 864, 872-73 (11th Cir. 1990); *Seaton v. Sky Realty Co., Inc.*,
491 F.2d 634, 636 (7th Cir. 1974). Key factors in determining the amount of compensation for
emotional distress are the complainants' reaction to the discriminatory conduct and the
egregiousness of respondents' behavior. *HUD v. Properties Unlimited*, 2 Fair Housing-Fair
Lending (P-H) ¶ 25,009, 25,151 (HUDALJ Aug. 5, 1991). Because it is difficult to evaluate the
emotional injuries which
result from civil rights deprivations, courts do not demand precise proof to support a reasonable
award of damages in such cases. *Blackwell*, 908 F. 2d at 874.

The $10,000 in emotional damages for Mr. Bad Horse and the $12,000 in emotional
damages that the Charging Party has requested ($22,000 family total), were based on a requested
finding of intentional discrimination on the basis of national origin. I have not found intentional
discrimination on the part of Respondents against the Complainants. The Charging Party
concedes that the Bad Horses had no basis for alleging familial status discrimination until alerted
by Mr. Burke, months after they have vacated the property in question. Further, Complainants
were not damaged as a result of the § 3604 (c) violation. Accordingly, their request for
compensation must be based on the emotional distress, inconvenience, and loss of housing
opportunity that resulted from Respondents' enforcement of an occupancy standard that unfairly
impacted upon them as a family.

Respondents asked Complainants to leave after complaints were lodged by another tenant
and after Respondents had reason to believe that Complainants had misrepresented the number
of people who would live in the unit. In asking Complainants to leave, Mr. Summy was
apologetic -- not hostile, badgering or harassing. He did not pressure them to leave immediately,
but gave them time to find alternative housing.

With regard to the reactions of the Complainants to their being asked by Respondents to
leave, Mrs. Bad Horse testified that she was shocked and hurt when she heard Mr. Summy say
they had to move. She wanted to know what they had done to deserve it. She worries to this
day that discrimination might happen to her again. She became more suspicious of people, and
anxious about finding another place to live. In assessing damages, I have not considered this

21

reaction because it was based on her belief that they were asked to move because they were Native American.

Mrs. Bad Horse also testified that the move was very stressful for her, having been accomplished by just her and her husband. She strained her back, causing such her to take a pain reliever and to lie down for a couple of days, during which time she could not spend time with her child. (TR. 86, 210-215). She is entitled to compensation for this stress and inconvenience.

Mr. Bad Horse testified that he was shocked at being told to move out "right out of the blue" when he felt he had done nothing wrong. (TR. 83). He moved without protest because he and his wife did not want to be where they were not wanted. He had never suffered discrimination before and this experience made him realize that discrimination "is nationwide and happens all the time" and made him worry that it might happen to his family again. In assessing damages, I have not considered this reaction because, again, it was based upon his belief that he was discriminated against because he was Native America.

Mr. Bad Horse also testified that he worried because he had a new wife and little girl and "hardly no money and no place yet to go." He had trouble concentrating on his work worrying about where he would find another place to live. (TR. 77, 84, 86). These worries surely were eliminated once he found new housing. The evidence also shows that the new apartment was three miles farther from Mr. Bad Horse's work. Thus, a degree of added inconvenience in his commute to work may be considered. I find that Mr. Bad Horse was inconvenienced by the requirement to move and that he is entitled to compensation on that basis.

However, Mr. Bad Horse's testimony shows that when his family moved to Sioux Falls, they really wanted to rent at an apartment complex with a washer and dryer but they did not have enough money to do so at the time. His pay day came while he was at 1311-1/2 South Duluth Avenue. After getting paid he had enough money to rent at an apartment complex. He moved to an apartment in a complex that had a washer and a dryer. (TR. 133). The evidence also shows that Mr. Bad Horse's reaction to having to move was to give a sigh of relief. He told Mr. Summy that Ms. Madrid complained all the time and he was glad to get away from her and that Mr. Carlson had done him a favor by not requiring him to honor his lease. (TR. 482).

Having considered all these factors, I conclude that Mr. Bad Horse is entitled to compensation for emotional distress, inconvenience and lost housing opportunity in the amount of $500, and Mrs. Bad Horse in the amount of $250.

### Civil Penalties

The Charging Party asserts that the nature and circumstances of the violations, including intentional discrimination based on national origin and familial status, argue for the imposition of a substantial civil penalty. Although Mr. Carlson no longer owns rental property, the Charging Party argues that he may in the future and that deterrence objectives should be considered not only to apply to Mr. Carlson but to deter others. The Charging Party urges the court to assess a civil penalty of $5,000 against Respondent Carlson and a civil penalty of $250 against Mr. Summy.

Large civil penalties would be inappropriate in this case. Neither Respondent engaged in intentional discrimination; neither had received any training about the Fair Housing Act; both



22

had only minimal involvement in the housing business; and both have since left the business.  A civil penalty of $1,000 against Respondent Carlson and $250 against Respondent Summy will suffice to vindicate the public interest.

### Injunctive Relief

The Act also authorizes "injunctive or other equitable relief".  42 U.S.C. § 3612 (g) (3).  The purposes of injunctive relief are to eliminate the effects of past discrimination, prevent future discrimination, and return aggrieved persons to the positions they would have been in absent the discrimination.  See Blackwell, *908 F.2d at 874; Park View Heights Corp. v. City of Black Jack*, 605 F.2d 1033, 1036 (8th Cir. 1979), *cert. denied*, 445 U.S. 905 (1980).  In its proposed injunctive order, the Charging Party requests only that Respondents be enjoined from discriminating in the future.  I have incorporated this injunction into the following Order.

### ORDER

It is hereby ORDERED that:

1. Respondents Richard D. Carlson and Dale Summy are permanently enjoined from discriminating against any person, or persons, with respect to housing based on

23

familial status.  Prohibited actions include, but are not limited to, those enumerated in 24 C.F.R. § 100.50.

2. Within forty-five (45) days of the date on which this Order becomes final, Respondents shall pay the following damages: $1,608 in out-of-pocket expense to Complainants Mr. and Mrs. Bad Horse; $500 for inconvenience, lost housing opportunity and emotional distress to Mr. Bad Horse; and $250 for inconvenience, lost housing opportunity and emotional distress to Mrs. Bad Horse.

3. Within forty-five (45) days of the date on which this Order becomes final, Respondent Carlson shall pay a civil penalty of $1,000 to the Secretary of HUD.

4. Within forty-five (45) days of the date on which this Order becomes final, Respondent Summy shall pay a civil penalty of $250 to the Secretary of HUD.

This Order is entered pursuant to 42 U.S.C. § 3612 (g)(3) and 24 C.F.R. § 104.910, and will become final upon the expiration of 30 days or the affirmance, in whole or in part, by the Secretary of HUD within that time.

CONSTANCE T. O'BRYANT
Administrative Law Judge



**EXHIBIT 4**

TO

DECLARATION OF JESSE WING

IN SUPPORT OF PLAINTIFF'S RESPONSE

IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,

AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**U.S. Department of Housing and Urban Development**





02883

Special Attention of:

**Transmittal** for Handbook No.: 8024.01, CHG-1,
REV-1

All FHEO Hub Directors
All Field Assistant General Counsels  Issued:
Assistant General Counsel,
  Fair Housing Enforcement Division
All FHEO Staff, Headquarters

---

1. This Transmits:

Two new chapters of the Title VIII Complaint Intake, Investigation,
and Conciliation Handbook, 8024.01 and a revised Exhibit 7-4
on Administrative Supoenas (from Chapter 7, 1995).

Chapter 2: Theories of Discrimination.  This Chapter describes
the theories of discrimination that form the basis of analysis
of housing discrimination cases under the Fair Housing Act.  It
covers: Single-Motive Cases; Mixed-Motive Cases; and Disparate
Impact Cases.

Chapter 8: Analysis of Specific Cases.  This Chapter discusses
how to analyze specific types of housing discrimination cases under
the  Act.  It covers: Harassment based on Race, Color, or
National Origin; Sexual Harassment; Gender Discrimination; and
Zoning and  other Land-Use Cases.

Revised Exhibit 7-4: This Exhibit describes the protections
and duties of persons subject to Administrative Supoenas.

Note that the first six chapters of the handbook cover:
Jurisdiction, Complaint Intake; Special Intake Processing;
Planning and Conducting the Investigation, Administrative
Closures, and Conciliation.


        Remove: Exhibit 7-4 from          Insert: Handbook 8024.01,
                Chapter 7, (1995)                 CHG-1, REV-1
                                                  Chapters 2&8, with
                                                  Appendices and Revised
                                                  Exhibit 7-4

                                          Assistant Secretary
                                          for Fair Housing and Equal Opportunity

8024.01, CHG-1

<u>Paragraph</u>                                                          <u>Page</u>
Table of Contents

CHAPTER  2.  THEORIES OF DISCRIMINATION

2-1   Introduction...........................................2-1

2-2   Single-Motive Intent Cases. . . . . . . . . . . . .2-4

      A.     Introduction....................................2-4
      B.     Direct & Indirect Evidence of Unlawful Motive. .2-5
      C.     Indirect Evidence and the "Prima Facie
             Case" Concept...................................2-7
             1.     Burdens of proof under the prima
                    facie case approach......................2-7
             2.     The initial elements of a prima
                    facie case..............................2-12
             3.     The Respondent's rebuttal and the
                    complainant's response..................2-16

2-3   Mixed-Motive Intent Cases...........................2-21

      A.     Comparison to Single-Motive Cases..............2-21
      B.     Fair Housing Cases Involving the Mixed-
             Motive Analysis  ..............................2-24
      C.     Investigating Mixed-Motive Cases...............2-25

2-4   Discriminatory Impact Cases.........................2-27

      A.     Introduction...................................2-27
      B.     Elements of a Discriminatory Impact Claim......2-30
      C.     Proving the Necessary Discriminatory Impact.....2-31
             1.     The basic approach......................2-31
             2.     Applying the basic approach:
                    A lender's minimum loan policy..........2-33
             3.     A note on local vs. national statistics. . 2-38
             4.     Other cases with less than ideal
                    statistics..............................2-39
      D.     The Rebuttal of a Discriminatory Impact Case....2-41
             1.     The legal standard......................2-41
             2.     Examples of evaluating the respondent's
                    rebuttal................ . . . . . .2-42
      E.     Review:  The Keys to Investigating a Discriminatory
             Impact Case....................................2-44

Exhibit 2-1   Price Waterhouse v. Hopkins
Exhibit 2-2   HUD v. Denton
Exhibit 2-3   Betsey v. Turtle Creek Associates

i

standard, where "common sense" seems to support this conclusion even though the statistical evidence is not strong.  This observation should not be taken as an excuse for producing weak statistical evidence in a discriminatory impact case.  It may, however, be used to justify reliance on the "next best" evidence if the data that might be hoped for in a perfect case simply cannot be produced even by a thorough investigation.

**D.    The Rebuttal of a Discriminatory Impact Case**

    1.    <u>The Legal Standard</u>

When the evidence is sufficient to make out a prima facie case of discriminatory impact, then the burden shifts to the respondent to come forward with a justification for its challenged policy, practice, or standard.  The exact nature of the respondent's burden of justification has been phrased in different ways by the courts, but the basic idea of this burden is captured in the phrase "business necessity."  Thus, a number of courts and HUD administrative law judges have held that, in order to rebut the inference of discrimination created by a showing of discriminatory impact, the respondent must prove "a business necessity sufficiently compelling to justify the challenged practice."

This means that the respondent must do more than simply articulate some legitimate, nondiscriminatory reason for its challenged policy, practice, or standard.  Rather, the respondent must show that its selection technique has a manifest relationship to the housing in question.  The justification must be substantial.

Essentially, the respondent must accomplish two things in order to satisfy its burden of justification.  First, it must identify a legitimate and substantial reason underlying its

8024.01, CHG-1

challenged policy.  Second, it must show by
objective evidence -- not merely its own
subjective opinion -- that its policy has a strong
relationship to the legitimate and substantial
goal that has been identified.  Another way of
saying this is that the policy must be shown to be
"closely tailored" to serve the identified goal.

If the respondent fails to offer any evidence in
support of the "business necessity" of its
challenged policy, then the inference of
discrimination created by the discriminatory
impact showing is unrebutted, and the complainant
will prevail.  In most cases, however, the
respondent will at least be able to articulate
some legitimate goal that the policy is allegedly
designed to serve, and the key will then be trying
to determine whether this policy is needed to
achieve this goal.

2.   Examples of Evaluating the Respondent's Rebuttal

In assessing the "business necessity" defense, the
fact finder is likely to be influenced by three or
four key types of evidence.  One is whether the
respondent can show that the identified problem
has in fact occurred in the past, as opposed to
simply being a prospective "worry" of the
respondent.  Another, and somewhat related, point
is whether the respondent has demonstrated the
seriousness of his concern over this problem by
consulting an "expert" about it, or whether the
respondent has simply relied on his own "gut
reaction" in addressing the problem.  If an expert
was consulted, when did this occur; specifically,
did it occur before the respondent instituted his
challenged policy -- indeed, did the expert
recommend adoption of this policy -- or was the
expert consulted only after the respondent
established the policy and/or was sued for
unlawful discrimination?

A final, and often decisive, element in assessing
the "business necessity" defense is related to
whether the respondent (and/or his expert if one
was consulted) considered any other alternatives

8024.01, CHG-1

for dealing with the identified problem and, if
so, why these alternatives were not adopted
instead of the challenged policy.  For example, in
one case where the "business necessity" defense
failed, the court was influenced by the fact that,
although the respondent sought to justify an
occupancy standard as a means of avoiding
excessive wear and tear on his units, he
admittedly had not considered any of the various
alternatives for achieving this goal that the
plaintiff suggested (e.g., detailed maintenance
requirements, more frequent inspections, higher
security deposits, and more careful tenancy
screening).  On the other hand, in a case where
the "business necessity" defense succeeded, the
landlord produced an expert who confirmed that the
apartment complex's hot water heating system could
not accommodate more than a certain number of
tenants and that the principal alternative to an
occupancy standard under these circumstances --
installing a new heating system -- would cost over
$1.6 million.  During investigation, the
availability of less discriminatory alternatives
should be examined with the respondent, the
complainant, and, if necessary, through
independent investigative sources.

Reflecting these areas of judicial concern, the
investigation of the "business necessity" defense
in a discriminatory impact case should include the
following elements: (1) the precise nature of the
problem that the respondent is trying to solve by
employing the challenged policy, practice, or
standard; (2) any evidence showing that this
problem has, in fact, occurred in the past or is
about to occur now; (3) the basis for the
respondent's belief that his policy will, in fact,
help solve this problem (including any reports or
other advice given to him by experts or other
disinterested persons), and when and how the basis
for this belief was formed; and (4) what other
alternatives for solving this problem may be
available (which might be identified by the



8024.01, CHG-1

respondent, the complainant, or some other
source), whether the respondent has ever
considered any of these alternatives, and why he
believes they are not as satisfactory a way to
deal with the problem as his adopted policy.
Finally, the respondent should also be asked
whether he knew or suspected that his adopted
policy would have a discriminatory impact on the
complainant's protected class, and whether he
considered this at all -- as a negative, a
positive, or not at all -- in his decision to
adopt this policy.

E.    **Review: The Keys to Investigating a Discriminatory
      Impact Case**

Every case in which a complainant alleges that he or
she has been rejected because of the application of an
apparently consistent policy or rule is potentially a
discriminatory impact case.  The first item that should
be explored in such a case is whether the case is
really better analyzed as one involving discriminatory
intent.  If, for example, the respondent's rule is
discriminatory "on its face" against a protected group
or, if the contested rule has been applied selectively
so as to discriminate against such a group, the case
may be appropriately analyzed under the theory of
disparate treatment, with the element of intent to be
demonstrated.  There may be other evidence of the
respondent's intentional discrimination in such cases,
including direct evidence in the form of statements by
the respondent indicating an intent to discriminate
and/or awareness by the respondent that his policy
would have the effect of excluding a large portion of
the complainant's protected class.  The investigator
should always be alert to the possibility that a case
which begins life looking like a discriminatory impact
case later be shown to be a disparate treatment case,
or may, indeed, involve actions that violate the Act
under *both* theories.

As for the applicability of the discriminatory impact
theory itself, the investigation must produce a proper
statistical basis for the fact-finder to conclude that
a given policy, practice or standard produces a

**<u>EXHIBIT 5</u>**

TO

DECLARATION OF JESSE WING

IN SUPPORT OF PLAINTIFF'S RESPONSE

IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,

AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
OFFICE OF ADMINISTRATIVE LAW JUDGES

The Secretary, United States
Department of Housing and Urban
Development, on behalf of
D. L. Bridges and
Hershey Barnett-Bridges,

                Charging Party,

        v.

Bernhard Ineichen,

              Respondent.

HUDALJ 05-93-0143-1
Decided: April 4, 1995

Bernard Ineichen, pro se

Steven Schaefer, Esquire
    For the Intervenors

Konrad Rayford, Esquire
    For the Secretary

Before:  Thomas C. Heinz
       Administrative Law Judge

## INITIAL DECISION

### Statement of the Case

This proceeding arises out of a complaint filed by D.L. Bridges ("Complainant D.L. Bridges" or "Mr. Bridges") and Hershey Barnett-Bridges ("Complainant Barnett-Bridges" or "Mrs. Bridges") alleging that Bernhard Ineichen ("Respondent") violated the Fair Housing Act, 42 U.S.C. § 360 *et seq.* (sometimes "the Act"), by refusing to rent or negotiate to rent an apartment because of Complainants' race and familial status.  The Department of Housing and Urban Development ("HUD" or "the Secretary") investigated the complaint, and after deciding that there was reasonable cause to believe that discriminatory acts had taken place, issued a Charge of Discrimination against

2

Respondent on August 2, 1994.  The Charge alleges that Respondent engaged in housing discrimination on the basis of familial status in violation of sections 804(a), (b), (c), and (d) of the Act (42 U.S.C. §§ 3604(a), (b), (c), and (d)), and sections 100.60, 100.65, 100.75, and 100.80 of the regulations (24 C.F.R. §§ 100.60, 100.65, 100.75, and 100.80).[1]

On September 9, 1994, Complainants' unopposed joint motion to intervene was granted.

Respondent failed to file an Answer to the Charge of Discrimination.  Pursuant to motion by the Charging Party to which Respondent filed no response, a Default Judgment was entered against Respondent on November 22, 1994.  On December 14, 1994, a hearing was held in Madison, Wisconsin, for the limited purpose of taking evidence on the appropriate relief to be awarded to the Charging Party.  Respondent appeared *pro se* at the hearing, at the close of which the parties were directed to file post-hearing briefs. The last brief was received on February 3, 1995.  Because Respondent failed to file an Answer to the Charge of Discrimination, the allegations of the Charge are deemed admitted pursuant to section 104.420 of the Rules of Practice governing this proceeding. 24 C.F.R. § 104.420.

In addition to filing a complaint with HUD, Complainant D.L. Bridges filed a complaint with the Equal Rights Division of the Department of Industry, Labor and Human Relations, State of Wisconsin, alleging that Respondent had violated the Wisconsin Open Housing Act by refusing to rent to him on the basis of race and familial status.  The allegations of discrimination on the basis of familial status were dismissed because at the time the discriminatory acts allegedly occurred, the Equal Rights Division did not have jurisdiction over complaints based on familial status.  After an evidentiary hearing at which both Complainant D.L. Bridges and Respondent appeared, a Wisconsin State administrative law judge on March 4, 1994, issued findings of fact, conclusions of law, and an order dismissing the allegations of race discrimination.  Pursuant to a motion by the Charging Party and the Intervenors, I take judicial notice of the findings of fact issued by the Wisconsin State administrative law judge as noted below.

**Findings of Fact**

---

[1]The Secretary concluded that there was no reasonable cause to believe that Respondent had engaged in housing discrimination on the basis of race or color.



3

1. Complainants D.L. Bridges and Hershey Barnett-Bridges are husband and wife. Mr. Bridges is a social worker for Dane County Human Services who earned $11.41 per hour in 1992. Mrs. Bridges is a public health nurse for the City of Madison, Wisconsin, who earned $19 per hour in 1992. They have four children who ranged in age from 9 to 16 years old in late June of 1992. Charge, ¶ II. 6; TR. 16-17, 62.

2. At all times material herein, Respondent owned seven residential housing units in two adjacent townhouses on Turbot Drive in Madison, Wisconsin. Charge, ¶ II.8.

3. In June of 1992 Complainant D.L. Bridges saw a listing for a three-bedroom townhouse apartment at 2962 Turbot Drive in a computer printout obtained from "Rent Search," an organization that lists housing for rent. The apartment was particularly attractive to Complainants because it was located a block from the apartment where they were then living. Charge, ¶ II. 9; Wisconsin Finding of Fact (hereinafter "W. F.of F.") number 3.

4. On or about June 19, 1992, Complainant D.L. Bridges telephoned Respondent and inquired about renting the apartment at 2962 Turbot Drive. Respondent said that he would call back that evening or the next day to schedule an appointment to show the property. During this conversation Respondent asked how many people would be living in the unit, to which Complainant D.L. Bridges responded, "Two adults and four children." Charge, ¶ II. 9; W. F.of F. 4.

5. Because Respondent did not return Complainant D.L. Bridges' telephone call as promised, on June 22, 1992, Complainant D.L. Bridges telephoned Respondent a second time. During this conversation Respondent said, "you are the one with the four children," and claimed the townhouse apartment had only two bedrooms, and had already been rented. Charge, ¶ II. 10; W. F.of F. 5.

6. After that telephone conversation, Complainant D.L. Bridges visited the subject property and learned from a neighbor that the unit at 2962 had three bedrooms and that it remained available for rent. Thereafter Mr. Bridges called Respondent a third time and asked to see the unit. Respondent told him that only two-bedroom units were available.

---

[2]Inasmuch as Complainants' children are not named as parties to this case, the Charging Party may not seek recovery on behalf of the children.

[3]W. F.of F. 5 places this telephone call on June 21 rather than June 22.



4

When Mr. Bridges informed Respondent that he was aware that the subject unit was a

three-bedroom unit and was still available, Respondent stated that the unit was too small for Complainants' family and refused to let them view it.  Charge, ¶ II. 11; W. F.of F. 6, 7.[4]

7. Respondent limited to four the number of persons who could occupy any of his three-bedroom townhouse units located on Turbot Drive.  Charge, ¶ II. 12.

8. The apartment at 2962 Turbot Drive has a total living area of approximately 679 square feet, consisting of a living room measuring 195 square feet, a kitchen of 99 square feet, an alcove of 18 square feet, and three bedrooms measuring approximately 191 square feet, 96 square feet, and 80 square feet.  Charge, ¶ II. 13.

10. In June 1992 Respondent also had a three-bedroom unit available for rent at 2972 Turbot Drive.  Charge, ¶ II. 17.

11. Respondent's three-bedroom rental units at 2962 and 2972 Turbot Drive would have accommodated Complainants' family without violating the City of Madison minimum occupancy standards or the State of Wisconsin minimum occupancy standards.  Charge, ¶ II. 15, 17.

12. The rental unit at 2962 Turbot Drive was available for inspection and rental as advertised at the time Mr. Bridges spoke to Respondent about it.  Respondent subsequently rented it to an adult couple with two children, who began their occupancy on or about July 1, 1992.  Charge, ¶ II. 16.

13. Respondent's policy prohibiting more than four persons from occupying the three-bedroom townhouse apartments on Turbot Drive was more restrictive than applicable governmental occupancy codes, and operated unreasonably to limit or exclude families with children.  Charge, ¶ II. 19

14. At the time Complainants sought to rent from Respondent, they were living in an apartment on Traceway Drive, Madison, Wisconsin, that rented for $665 per month.  They were told in June 1992 that they had to move by the end of July because the

---

[4]According to W. F.of F. 7, Respondent also told Mr. Bridges during their third telephone conversation, "I can rent to whoever I want to rent to."

5

property had been sold to a new owner who wanted to have a member of his family occupy the apartment.  Transcript (hereinafter "TR.") 16, 18, 66.

15. Respondent's rental property at 2962 Turbot Drive abuts the apartment on Traceway Drive where Complainants lived.  Had Respondent rented to Complainants, their children could have continued to attend schools in the same district where they had been going to school for five years, and family members could have easily maintained their relationships with neighbors, neighborhood civic organizations, and their church. TR. 21-22.

16. Complainants were unable to find suitable housing in the Traceway Drive area, and after spending many hours searching, they moved into an apartment that rented for $525 per month on Carling Drive in Madison, where they lived for one year beginning on or about August 1, 1992.  TR. 16, 22, 23, 25, 26, 55, 56, 59, 66.

17. Complainants suffered emotional stress as a result of living in the apartment on Carling Drive.  After the move, two of the children, who had been able to walk to school before, now had to ride buses to new schools where they had difficulty adapting.  That difficulty distressed their parents.  TR. 34-36.  While at the Carling Drive location, Complainants and their children were troubled by repeated roach infestations, noisy neighbors who partied and played loud music late into the night, neighbors engaged in illegal drug trafficking, trash strewn about the building, repeated fights between neighbors causing police visits, vandalism of their clothes washer, lack of a safe place for the children to play, and unresponsive property managers.  TR. 26, 29, 31, 33, 43, 44.

18. During the period Complainants lived on Carling Drive, they both had longer commutes to and from work than they would have had had they been able to rent Respondent's apartment.  Mr. Bridges' commute was five miles longer each way, and Mrs. Bridges' commute was six miles longer each way.  TR. 18, 38, 39, 61.

19. After living for a year on Carling Drive, the Bridges family moved to another location in Madison, where the conditions were better.  This move cost $240 for truck rental, gasoline, and hired help.  TR. 25, 40-43, 59.

20. Respondent's property on Turbot Drive was in excellent condition and well-maintained.  All of the parties testified that, as far as they could tell, Respondent's tenants on Turbot Drive were not subjected to drug problems, police visits, or inconsiderate neighbors.  Within walking distance were stores, shops, banks, and a place for children to play.  TR. 43-46, 74-75.



6

## Subsidiary Findings and Discussion

The Congress passed the Fair Housing Act to "[e]nsure the removal of artificial, arbitrary, and unnecessary barriers when the barriers operate invidiously to discriminate on the basis of impermissible characteristics." *United States v. Parma,* 494 F. Supp. 1049, 1053 (N.D. Ohio 1980), *rev'd on other grounds,* 661 F.2d 562 (6th Cir. 1981), *cert. denied,* 456 U.S. 926 (1982). *See also United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir. 1974), *cert. denied,* 422 U.S. 1042 (1975); *cf. Griggs v. Duke Power Co.,* 401 U.S. 424 (1971). The Act was designed to prohibit "all forms of discrimination [even the] simple-minded." *Williams v. Matthews Co.,* 499 F.2d 819, 826 (8th Cir. 1974), *cert. denied,* 419 U.S. 1021, 1027 (1974).

On September 13, 1988, the Act was amended to prohibit, *inter alia,* housing practices that discriminate on the basis of familial status[5]. 42 U.S.C. §§ 3601-19. "Familial status," as relevant to this case, is defined by the Act as "one or more individuals (who have not attained the age of eighteen years) being domiciled with ... (1) a parent or another person having legal custody of such individual or individuals ...." *Id.* at § 3602(k); 24 C.F.R. § 100.20. Complainants and their children fall within this definition.

The Act makes it unlawful for anyone to:

> refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of ... familial status ....

42 U.S.C. § 3604(a). The Act also prohibits a housing provider from "discriminat[ing]

---

[5]In amending the Act, Congress recognized that "families with children are refused housing despite their ability to pay for it." H.R. Rep. No. 711, 100th Cong, 2d Sess., at 19 (1988). Congress cited a survey finding that 25 percent of all rental units exclude children and that 50 percent of all rental units have policies restricting families with children in some way. *Id., citing* Marans, *Measuring Restrictive Rental Practices Affecting Families with Children: A National Survey,* Office of Policy Planning and Research, HUD (1980). The survey found also that almost 20 percent of families with children were forced to live in un desirable housing due to restrictive housing policies. *Id.* Congress therefore intended the 1988 amendments to remedy these problems for families with children.

7

against any person in the terms, conditions, or privileges of sale or rental of a dwelling ... because of familial status ..."  42 U.S.C. § 3604(b).

Further, it is unlawful to:

> make ... any ... statement ... with respect to the ... rental of a dwelling that indicates any preference, limitation, or discrimination based on ... familial status ... or an intention to make any such preference, limitation, or discrimination.

*Id.* at § 3604(c).  This provision applies to all written or oral statements made by a person engaged in the rental of a dwelling.  24 C.F.R. § 100.75(b), (c)(1) and (2).

Finally, 42 U.S.C. § 3604(d) makes it unlawful to "represent to any person because of ... familial status ... that any dwelling is not available for ... rental when such dwelling is in fact so available."

By refusing to rent a three-bedroom townhouse unit on Turbot Drive to Complainants because of the size of their family, Respondent denied or otherwise made unavailable a rental unit based on familial status in violation of 42 U.S.C. § 3604(a). Charge, ¶ II. 20.  By applying an occupancy policy that unreasonably limited the number of people who may occupy three-bedroom units on Turbot Drive, Respondent applied differential terms and conditions based on familial status in violation of 42 U.S.C. § 3604(b).  Charge, ¶ II. 21.  When Respondent told Complainant D.L. Bridges that the apartment at 2962 Turbot Drive had only two bedrooms and that it was too small for Complainants' family, Respondent expressed a preference, limitation, or discrimination based on familial status in violation of 42 U.S.C. § 3604(c).  When Respondent falsely stated that the apartment at 2962 Turbot Drive had been rented, he violated 42 U.S.C. § 3604(d).

In his post-hearing brief Respondent argues to the effect that, in his judgment, the apartment was too small for Complainants' family, that Complainants could have afforded a much larger apartment with their income, that the Madison Area Apartment Association has stated that "the laws allow landlords to determine their own reasonable guidelines" regarding occupancy limits, and that this case should be dismissed as it was dismissed by the State of Wisconsin.  Inasmuch as a Default Judgment was issued against Respondent on November 22, 1994, the arguments addressing the merits of the case come much too late to be credited.  But even if the Default Judgment had not been issued, Respondent's arguments would still be rejected.  Landlords may impose *reasonable* occupancy limits only.  Respondent has offered no rationale to support his conclusion that his occupancy

8

limit for the three-bedroom apartments on Turbot Drive was reasonable.  The fact that the City of Madison and the State of Wisconsin permit an adult couple with four children to occupy the Turbot Drive apartments undermines the argument that Respondent's more

restrictive limit was reasonable.  Respondent's subjective conviction is not enough to satisfy his burden to prove the reasonableness of his occupancy limit.

Respondent likewise misses the mark with his argument regarding the size of apartment that Complainants could afford to rent, because Complainants were free to spend whatever percentage of their disposable income on housing that they chose.  That decision was not for a prospective landlord to make.  Finally, that Complainants' allegations of discrimination were dismissed in the Wisconsin State administrative proceeding is irrelevant in this proceeding.  The State proceeding was dismissed upon a finding that there was no merit to the complaint of housing discrimination based on race. That proceeding did not reach the merits of Complainants' charge of housing discrimination based on familial status, the issue in this proceeding.

## Remedies

Section 812(g)(c) of the Act provides that upon a finding that a respondent has violated the Act, an administrative law judge shall order "such relief as may be appropriate, which may include actual damages suffered by the aggrieved person." 42 U.S.C. § 3612(g)(3).  In the instant case, Respondent has violated the Act through conduct that has caused actual, compensable damages to Complainants.

### Complainants' Damages

#### Out-of Pocket Expenses

Complainants are entitled to compensation for the tangible expenses caused by Respondent's denial of housing. *See, e.g., HUD ex rel. Herron v. Blackwell,* 908 F.2d 864, 873 (11th Cir. 1990)(hereinafter *Blackwell II); Thronson v. Meisels,* 800 F.2d 136, 140 (7th Cir. 1986).  The Intervenors request a total of $5,313.15 in damages for out-of-pocket expenses, consisting of:

(1) Additional travel to and from work for
Mr. Bridges:  12 miles x 5 days per week x 50 weeks
per year x $.26 per mile =                                    $ 780.00

(2) Truck rental for moving =                                 240.00

9

(3) Wage loss for Mr. Bridges seeking alternative
housing:     $11.41 per hour x 150 hours =                    1,711.50

(4) Repair of washer =                                          300.00

(5) Wage loss for Mr. Bridges pursuing claim:
$11.41 per hour x 65 hours =                                    741.65

(6) Additional travel to and from work for
Mrs. Bridges:  12 miles x 5 days per week x 50 weeks
per year x $0.26 per mile =                                     780.00

(7) Wage loss for Mrs. Bridges seeking alternative
housing:  $19.00 per hour x 40 hours =                          760.00

The Charging Party requests a total of $5,244.25 in damages for out-of-pocket
expenses, consisting of:

(1) Additional travel to and from work for
Mr. Bridges: 11 miles x 240 days x $0.30 per mile =       $  792.00

(2) Moving expenses ($240 truck rental, gasoline,
 movers, and $760 for 40 hours of Mrs. Bridges'
 time) =                                                      1,000.00

(3) Wage loss for Mr. Bridges pursuing claim:
$11.50 per hour x 32.5 hours =                                  373.75

(4) Wage loss for Mrs. Bridges pursuing claim:
$19.00 per hour x 32.5 hours =                                  617.50

(5) Additional travel to and from work for
Mrs. Bridges:  6 miles x 240 days x $0.30 per mile =            432.00

(6) Time spent searching for alternative housing
by Mr. Bridges (150 hours x $11.50 per hour) =                1,725.00

(7) Time spent searching for alternative housing
by Mrs. Bridges (16 hours x $19.00 per hour) =                  304.00

Complainants who are unlawfully denied housing may receive compensation for
time spent looking for alternative housing and additional expenses associated with living



10

in alternative housing. *Brown v. Ballas,* 331 F. Supp. 1033 (N.D. Tex. 1971); *HUD v. Edelstein,* Fair Housing-Fair Lending (P-H) ¶ 25,236 at 25,241 (HUDALJ Dec. 9, 1991). Complainants' alternative housing on Carling Drive was five miles further from Mr. Bridges' work and six miles further from Mrs. Bridges' work than Respondent's apartments on Turbot Drive.[6] Complainants will be awarded damages for the longer commutes they had to and from work during the year they lived on Carling Drive. Compensation will be at the rate of $0.25 per mile (the federal mileage compensation rate during that year) times 240 days (5 days per week x 4 weeks per month x 12 months per year), for a total of $600 for Mr. Bridges and $720 for Mrs. Bridges.

Complainant D.L. Bridges testified that he spent about 150 hours looking for alternative housing. Mr. Bridges did not describe his search in detail. For example, he did not demonstrate how many three-bedroom apartments were advertised in local newspapers during the period of his search, the number of telephone calls he made, the number of apartments he viewed, the number he applied for, the price range he was looking in, or the reasons he rejected whatever number of three-bedroom apartments that were on the market at that time in that price range. In the absence of credible evidence showing exactly what Mr. Bridges did during his search for alternative housing, I find incredible the claim that he spent 150 hours looking for another apartment during the month following Respondent's denial of housing.[7] One hundred fifty hours amounts to

---

[6]Complainant Hershey Barnett-Bridges testified that the Carling Drive apartment was 12 miles from her work and the Traceway Drive apartment (which abutted Respondent's apartments on Turbot Drive) was six miles from her work. TR. 39. Although somewhat inconsistent, the thrust of Complainant D.L. Bridges' testimony on this point was that he drove an additional five miles each way to and from work as a result of living on Carling Drive rather than in the Traceway Drive-Turbot Drive neighborhood. TR. 61, ll. 1-8.

[7]The record indicates Complainants found alternative housing during the month following the rejection by Respondent on June 22, 1992. They lived on Carling Drive for a year ending July 31, 1993, and Mrs.

11

nearly 19 eight-hour days. That is an unreasonable amount of time based on this record. Accordingly, Complainant D.L. Bridges will be compensated at the rate of $11.41 per hour, his wage at that time, for 100 hours spent looking for alternative housing.[8]

Complainant Hershey Barnett-Bridges testified that she took off two days from work to look for another place to live after her husband was turned away by Respondent. TR. 25, 56. She will be compensated at the rate of $19 per hour, her wage at that time, for the 16 hours she spent looking for alternative housing. She cannot be compensated for the time she said she spent packing and moving to the Carling Drive apartment because that was time she would have had to spend if Respondent had agreed to rent the Turbot Drive apartment to Complainants. No claim has been made for the time spent packing and moving from the Carling Drive apartment.

While living on Carling Drive, Complainants' clothes washer was vandalized. Intervenors request an award of $300 to cover the repair of the washer. However, the record will not support the requested award. Mr. Bridges did not testify that he actually spent any money to repair the washer. Rather, he estimated that it would cost from $150 to $300 to fix it. TR. 158. But Mr. Bridges was not shown to have any commercial expertise in the repair of clothes washers. Therefore, even if we assume for purposes of argument that Respondent "caused" this injury by refusing to rent to Complainants, Mr. Bridges' testimony does not justify an award for repair of the clothes washer.

Both the Charging Party and Intervenors request an award of $240 to cover the

---

Bridges said she spent about a week packing and moving after finding the new apartment. TR. 25. Complainants therefore must have selected the Carling Drive apartment by July 24, 1992.

[8]At page 55 of the transcript, Mr. Bridges testified that he earned "about 11.50 per hour," but on page 62 he testified more precisely, saying that he earned $11.41 per hour.

12

cost of a rented truck, gasoline, and hired help for the move from Carling Drive, a move they would not have had to make if Respondent had rented the apartment on Turbot Drive to Complainants. The requested amount will be awarded.

Victims of housing discrimination may recover for lost wages and other incidental expenses associated with preparation for and participation in the hearing leading to their recovery. *See, e.g., HUD v. Murphy,* 2 Fair Housing-Fair Lending (P-H) ¶ 25,002 at 25,054; *HUD v. Blackwell,* 2 Fair Housing-Fair Lending (P-H) ¶ 25,001 (hereinafter *Blackwell I*) at 25,010, *aff'd,* 908 F.2d 864 (11th Cir. 1990). Intervenors request an award to Mr. Bridges based on an assertion that he spent 65 hours pursuing this claim. The Charging Party asks that both Complainants receive awards, alleging that each spent 32.5 hours pursuing this claim. These requests are excessive and unreasonable. The parties have known that this is a default case since at least November 22, 1994, when the Default Judgment was issued. The issues addressed at the December hearing were simple and straightforward. Presentation of all testimony took less than two hours. No exhibits were introduced, and the transcript of the hearing covers a scant 81 pages. In these circumstances, Complainants will each be compensated for 20 hours spent pursuing this claim.[9]

## Emotional Damages

---

[9]Exaggerated claims for out-of-pocket expenses tend to undermine the general credibility of claimants, including requests for the award of intangible damages.

13

Actual damages in housing discrimination cases are not limited to out-of-pocket losses, but may also include damages for intagible injuries such as embarrassment, humiliation, and emotional distress caused by the discrimination.[10]  Damages for emotional distress may be based on inferences drawn from the circumstances of the case, as well as on testimonial proof.[11]  Because emotional injuries are by nature qualitative and difficult to quantify, courts have awarded damages for emotional harm without requiring proof of the actual dollar value of the injury.[12]  The amount awarded should make the victim whole.[13]

The Charging Party requests awards of $7,500 each to Complainants to compensate them for their emotional damages, plus an award of $2,500 for a lost housing opportunity.  Intervenors request a total of $30,000 for Mr. and Mrs. Bridges.  They will be awarded $4,000 each for emotional damages and a lost housing opportunity.

Complainants' requests for emotional damage awards rest on their very unpleasant

---

[10]*See, e.g., Blackwell I* at 25,011; *HUD v. Murphy,* Fair Housing-Fair Lending (P-H) ¶ 25,002 at 25,055 (HUDALJ July 13, 1990); *See also Smith v. Anchor Bldg. Corp.,* 536 F.2d 231 (8th Cir. 1976); *Steele v. Title Realty Co.,* 478 F.2d 380, 384 (10th Cir. 1973); *McNeil v. P N & S Inc.,* 372 F. Supp. 658 (N.D. Ga. 1973).

[11]*Blackwell II,* 908 F.2d 864, 872 (11th Cir. 1990); *Murphy* at 25,055; *See also Marable v. Walker,* 704 F.2d 1219, 1220 (11th Cir. 1983); *Gore v. Turner,* 563 F.2d 159, 164 (5th Cir. 1977).

[12]*See, e.g., Block v. R.H. Macy & Co.,* 712 F.2d 1241, 1245 (8th Cir. 1983); *Steele v. Title Realty Co.,* 478 F.2d 380, 384 (10th Cir. 1973); *Blackwell I* at 25,011. *See also Blackwell II,* 908 F.2d at 872-73 (recovery for distress is not barred because amount of damages is incapable of exact measure).

[13]*See Murphy* at 25,056; *Blackwell I* at 25,013.

14

experiences living in alternative housing on Carling Drive.  The household was disrupted
by roach infestations that required repeated professional treatment and by noisy, slovenly,
quarrelsome, and lawless neighbors whose behavior prompted at least three police visits.
Late-night noise, including drug busts, interfered with Mr. Bridges' sleep to the point that
his performance at work deteriorated.  Mrs. Bridges said that they complained about
conditions to the building manager at least once a month during their tenancy to little
avail.  She also testified that she was particularly concerned that there was no safe place
near the Carling Drive apartment for the children to play where she could keep an eye on
them, and that unlike the Turbot Drive apartment, there were no friendly neighbors to
supervise their children after school until she and her husband came home from work.  If
Complainants had been able to live in Respondent's apartment on Turbot Drive, the
youngest children would have been able to continue walking to and from school.  While
on Carling Drive, they had to take the bus.  This complication to the children's routine
compounded Mrs. Bridges' worries about her children's safety throughout the year they
lived on Carling Drive.

    When Respondent refused to rent to them, Complainants were forced to find new
housing in a relatively short time and move out of a neighborhood with valued amenities
where they had lived for many years and where they had established solid, nurturing
relationships with friends, neighbors, schools, and other institutions.  This would have
been a wrenching experience for the family even if the alternative housing had been
satisfactory.  But it was not.  As Mrs. Bridges put it:

> The kids were having a terrible time dealing with it.  We couldn't get the
> roach problem straightened out.  I mean ... the drug busts, the police, the
> neighbors, the property managers who weren't dealing with anything.  We
> just couldn't stay there. [TR. 42.]

    This evidence will support substantial damage awards to Complainants for the
emotional distress they suffered while living on Carling Drive and for their lost
opportunity to rent Respondent's apartment, but the record is not strong enough to justify
the amounts sought by the Charging Party and Intervenors.  Complainants' damages
claims rest entirely on their move into unsatisfactory alternative housing.  They do not
claim to suffer any continuing or permanent emotional injuries.  Despite the
unwholesome environment at Carling Drive, neither Complainant suffered any physical
harm or permanent psychological injury as a result of living there.  They did not require
intervention by medical or psychological experts.  A good share of Complainants' distress
was caused by their neighbors, but noisy, quarrelsome, even lawless neighbors can be
encountered anywhere.  Furthermore, at least some measure of Complainants' discomfort
with the Carling Drive apartment must be attributed to the fact that it was more than 20
percent less expensive than their apartment on Traceway Drive (and less than half as

15

expensive as the apartment where they now live).[14]  In other words, the Carling Drive apartment was a significantly less desirable place to live than the Traceway Drive apartment, and victims of housing discrimination cannot be compensated for living in less desirable alternative housing as such.[15]  The record does not show that alternative housing comparable in quality to the denied housing was unavailable in July of 1992 and that Complainants had no choice but to take the apartment on Carling Drive.  Considering the record as a whole, I conclude that an award of $4,000 each will adequately compensate Complainants for their emotional distress and lost housing opportunity.

## Civil Penalties

To vindicate the public interest, the Act authorizes an administrative law judge to impose civil penalties upon respondents who violate the Act. 42 U.S.C. § 3612(g)(3)(A); 24 C.F.R. § 104.910(b)(3).  Determining an appropriate penalty requires consideration of five factors:  (1) the nature and circumstances of the violation; (2) whether the respondent has previously been adjudged to have committed unlawful housing discrimination; (3) respondent's financial resources; (4) the degree of respondent's culpability; and (5) the goal of deterrence. *See Murphy* at 25,058; *Blackwell I*, at 25,014-15; H. Rep. No. 711, 100th Cong., 2d Sess. at 37 (1988).

### Nature and Circumstances of Violation

The nature and circumstances of the violation in this case do not compel imposition of the maximum penalty possible.  There is no evidence that Respondent's unlawful discrimination was motivated by animus toward Complainants personally or against families with children in general.  He has often rented to families with children. He discriminated against Complainants only because he believed that the apartment at 2962 Turbot Drive was too small for their family.  Further, the harm done to Complainants, although significant, was not extreme.  They and their children did not suffer grievous injury, such as an eviction, public humiliation, physical injury, or threats of physical injury at the hands of Respondent.

---

[14]The Traceway Drive apartment rented for $665 per month, whereas the Carling Drive apartment cost $525 per month.  Complainants and their children now live in an apartment than rents for $1,100 per month. TR. 66.

[15]It is unclear from the record what rent Respondent charged for the Turbot Drive apartment.  On brief he contends that the rent was $540 per month, but appended to his brief is a copy of HUD's investigation report indicating that the rent for 2962 Turbot Drive was $575 per month beginning July 1, 1992, and $600 per month for 2972 Turbot Drive beginning September 1, 1992.

16

Respondent appears to have cooperated fully with HUD during the investigation of this matter.

## Respondent's Record

There is no evidence that Respondent previously has been found to have committed an unlawful discriminatory housing practice. Consequently, the maximum civil penalty that may be assessed against Respondent is $10,000, pursuant to 42 U.S.C. § 3612(g)(3)(A) and 24 C.F.R. § 104.910(b)(3)(i)(A).

## Respondent's Financial Circumstances

Evidence regarding Respondent's financial circumstances is peculiarly within his knowledge, so he had the burden of introducing such evidence into the record. Respondent testified that his financial circumstances would permit him to pay the maximum civil penalty without suffering undue hardship. TR. 72-73.

## Culpability

Respondent does not deny that he turned Complainants away because of the size of their family, but he contends that his occupancy policy was reasonable and that he was unaware of the law requiring him to rent the apartment on Turbot Drive to Complainants. TR. 78. Although Respondent apparently is not a full-time housing provider (he is a carpenter by profession), in the fall of 1992 he owned 18 housing units, and he has been a landlord for many years. (Exhibit to Respondent's Brief) He must therefore be held to the highest standards of conduct.[16] Respondent sincerely (but mistakenly) believed that an occupancy policy deemed reasonable by him would necessarily be deemed reasonable in the eyes of the law.

## Deterrence

Respondent and other housing providers need to be deterred from engaging in any form of discriminatory conduct based on familial status. He and other similarly situated

---

[16]The civil penalty would be considerably lower if Respondent had not untruthfully told Complainant D.L. Bridges during their second telephone conversation that the apartment at 2962 Turbot Drive had only two bedrooms and that it was no longer available for rent.



17

landlords must come to understand that they may be guilty of unlawful discrimination even if they do not exclude all children from their rental properties. They have a duty to ensure that their occupancy policies are reasonable.

\*     \*     \*

The Charging Party seeks to impose a $10,000 civil penalty against Respondent, the maximum permissible in this case. Maximum penalties should be reserved for the most egregious cases, where willful conduct causes grievous harm--that is, where all factors argue for the maximum penalty. This case does not fall into that category. A civil penalty of $3,500 will vindicate the public interest.

### Injunctive Relief

An administrative law judge may order injunctive or other equitable relief to make a complainant whole and protect the public interest in fair housing. 42 U.S.C. § 3612(g)(3). The Charging Party in its brief requested injunctive relief but did not provide a proposed order. When injunctive relief is sought, it is the duty of the movant to specify in detail the nature of the relief sought. Absent that information, nothing more than a generally prohibitory order will be issued.

### Conclusion

Respondent has violated sections 804(a), (b), (c), and (d) of the Fair Housing Act. 42 U.S.C. §§ 3604(a), (b), (c), and (d). As a result of Respondent's conduct, Complainants suffered actual damages for which they will each receive a compensatory award. Further, to vindicate the public interest, an injunction will be ordered against Respondent as well as a civil penalty.

### ORDER

It is hereby ORDERED that:

1. Respondent is permanently enjoined from discriminating against Complainants, any member of their family, or any tenant or prospective tenant, with respect to housing because of familial status.

2. Within thirty (30) days of the date on which this Order becomes final, Respondent shall pay actual damages of $6,209.20 to Complainant D.L. Bridges, consisting of $4,000 for emotional distress and a lost housing opportunity, $600 for

18

additional commute expenses, $240 for moving expenses, $1,141 for time spent looking for alternative housing, and $228.20 for time spent pursuing this claim.

3. Within thirty (30) days of the date on which this Order becomes final, Respondent shall pay actual damages of $5,404 to Complainant Hershey Barnett-Bridges, consisting of $4,000 for emotional distress and a lost housing opportunity, $720 for additional commute expenses, $304 for time spent looking for alternative housing, and $380 for time spent pursuing this claim.

4. Within thirty (30) days of the date on which this Order becomes final, Respondent shall pay a civil penalty of $3,500 to the Secretary of HUD.


This Order is entered pursuant to 42 U.S.C. § 3612(g)(3) of the Fair Housing Act and the regulations codified at 24 C.F.R. § 104.910, and will become final upon the expiration of thirty (30) days or the affirmance, in whole or in part, by the Secretary within that time.


THOMAS C. HEINZ
Administrative Law Judge

Dated: April 4, 1995.



# **EXHIBIT 6**

TO

DECLARATION OF JESSE WING

IN SUPPORT OF PLAINTIFF'S RESPONSE

IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,

AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT



Tuesday
December 22, 1998

Part V

# Department of Housing and Urban Development

Fair Housing Enforcement—Occupancy
Standards; Statement of Policy; Notice;
Republication

Federal Register / Vol. 63, No. 245 / Tuesday, December 22, 1998 / Notices

MENT OF HOUSING AND
DEVELOPMENT

[o. FR–4405–N–01]

sing Enforcement—
ncy Standards; Notice of
nt of Policy

his document, FR Doc. 98–33568,
nally published on December 18,
3 FR 70256–70257. It is being
ied to reproduce the camera copy of
ndix furnished by the agency.

: Office of the Assistant
ry for Fair Housing and Equal
unity, HUD.

Notice of Statement of Policy.

RY: This statement of policy
s the public of the factors that
ill consider when evaluating a
g provider's occupancy policies
rmine whether actions under the
er's policies may constitute
ninatory conduct under the Fair
ng Act on the basis of familial
(the presence of children in a
). Publication of this notice meets
uirements of the Quality Housing
ork Responsibility Act of 1998.

: Effective date: December 18,

URTHER INFORMATION CONTACT: Sara
Director, Office of Investigations,
: of Fair Housing and Equal
rtunity, Room 5204, 451 Seventh
:, SW, Washington, DC 20410,
hone (202) 708–2290 (not a toll-free
ber). For hearing- and speech-
ired persons, this telephone
ber may be accessed via TTY (text
hone) by calling the Federal
mation Relay Service at 1–800–
8339 (toll-free).

SUPPLEMENTARY INFORMATION:

Statutory and Regulatory Background

Section 589 of the Quality Housing
and Work Responsibility Act of 1998
(Pub. L. 105–276, 112 Stat. 2461,
approved October 21, 1998, "QHWRA")
requires HUD to publish a notice in the
Federal Register that advises the public
of the occupancy standards that HUD
uses for enforcement purposes under
the Fair Housing Act (42 U.S.C. 3601–
3619). Section 589 requires HUD to
publish this notice within 60 days of
enactment of the QHWRA, and states
that the notice will be effective upon
publication. Specifically, section 589
states, in relevant part, that:

[T]he specific and unmodified standards
provided in the March 20, 1991,
Memorandum from the General Counsel of
[HUD] to all Regional Counsel shall be the
policy of [HUD] with respect to complaints
of discrimination under the Fair Housing Act
* * * on the basis of familial status which
involve an occupancy standard established
by a housing provider.

The Fair Housing Act prohibits
discrimination in any aspect of the sale,
rental, financing or advertising of
dwellings on the basis of race, color,
religion, national origin, sex or familial
status (the presence of children in the
family). The Fair Housing Act also
provides that nothing in the Act "limits
the applicability of any reasonable local,
State or Federal restrictions regarding
the maximum number of occupants
permitted to occupy a dwelling." The
Fair Housing Act gave HUD
responsibility for implementation and
enforcement of the Act's requirements.
The Fair Housing Act authorizes HUD to
receive complaints alleging
discrimination in violation of the Act, to

investigate these complaints, and to
engage in efforts to resolve informally
matters raised in the complaint. In cases
where the complaint is not resolved, the
Fair Housing Act authorizes HUD to
make a determination of whether or not
there is reasonable cause to believe that
discrimination has occurred. HUD's
regulations, implementing the Fair
Housing Act (42 U.S.C. 3614) are found
in 24 CFR part 103.

In 1991, HUD's General Counsel,
Frank Keating, determined that some
confusion existed because of the
absence of more detailed guidance
regarding what occupancy restrictions
are reasonable under the Act. To
address this confusion, General Counsel
Keating issued internal guidance to
HUD Regional Counsel on factors that
they should consider when examining
complaints filed with HUD under the
Fair Housing Act, to determine whether
or not there is reasonable cause to
believe discrimination has occurred.

This Notice

Through this notice HUD implements
section 589 of the QHWRA by adopting
as its policy on occupancy standards,
for purposes of enforcement actions
under the Fair Housing Act, the
standards provided in the Memorandum
of General Counsel Frank Keating to
Regional Counsel dated March 20, 1991,
attached as Appendix A.

**Authority:** 42 U.S.C. 3535(d), 112 Stat.
2461.

**Dated:** December 14, 1998.

Eva M. Plaza,

*Assistant Secretary for Fair Housing and
Equal Opportunity.*

BILLING CODE 4210–23–P

Federal Register / Vol. 63, No. 245 / Tuesday, December 22, 1998 / Notices

70983



U. S. Department of Housing and Urban Development
Washington, D.C. 20410-0500

APPENDIX A

March 20, 1991

OFFICE OF GENERAL COUNSEL

MEMORANDUM FOR:  All Regional Counsel

FROM: /s/ Frank Keating, G

SUBJECT:  Fair Housing Enforcement Policy:  Occupancy Cases

     .On February 21, 1991, I issued a memorandum designed to
facilitate your review of cases involving occupancy policies
under the Fair Housing Act.  The memorandum was based on my
review of a significant number of such cases and was intended to
constitute internal guidance to be used by Regional Counsel in
reviewing cases involving occupancy restrictions.  It was not
intended to create a definitive test for whether a landlord or
manager would be liable in a particular case, nor was it intended
to establish occupancy policies or requirements for any
particular type of housing.

     However, in discussions within the Department, and with the
Department of Justice and the public, it is clear that the
February 21 memorandum has resulted in a significant
misunderstanding of the Department's position on the question
of occupancy policies which would be reasonable under the Fair
Housing Act.  In this respect, many people mistakenly viewed the
February 21 memorandum as indicating that the Department was
establishing an occupancy policy which it would consider
reasonable in any fair housing case, rather than providing
guidance to Regional Counsel on the evaluation of evidence in
familial status cases which involve the use of an occupancy
policy adopted by a housing provider.

     For example, there is a HUD Handbook provision regarding
the size of the unit needed for public housing tenants.  See
Handbook 7465.1 REV-2, Public Housing Occupancy Handbook:
Admission, revised section 5-1 (issued February 12, 1991).  While
that Handbook provision states that HUD does not specify the
number of persons who may live in public housing units of various
sizes, it provides guidance about the factors public housing
agencies may consider in establishing reasonable occupancy
policies.  Neither this memorandum nor the memorandum of February
21, 1991 overrides the guidance that Handbook provides about
program requirements.

As you know, assuring Fair Housing for all is one of
ecretary Kemp's top priorities.  Prompt and vigorous enforcement
f all the provisions of the Fair Housing Act, including the
rotections in the Act for families with children, is a critical
esponsibility of mine and every person in the Office of General
ounsel.  I expect Headquarters and Regional Office staff to
ontinue their vigilant efforts to proceed to formal enforcement
.n all cases in which there is reasonable cause to believe that a
iscriminatory housing practice under the Act has occurred or is
.bout to occur.  This is particularly important in cases where
)ccupancy restrictions are used to exclude families with children
)r to unreasonably limit the ability of families with children to
)btain housing.

In order to assure that the Department's position in the
area of occupancy policies is fully understood, I believe that it
is imperative to articulate more fully the Department's position
on reasonable occupancy policies and to describe the approach
that the Department takes in its review of occupancy cases.

Specifically, the Department believes that an occupancy
policy of two persons in a bedroom, as a general rule, is
reasonable under the Fair Housing Act.  The Department of Justice
has advised us that this is the general policy it has
incorporated in consent decrees and proposed orders, and such a
general policy also is consistent with the guidance provided to
housing providers in the HUD handbook referenced above.  However,
the reasonableness of any occupancy policy is rebuttable, and
neither the February 21 memorandum nor this memorandum implies
that the Department will determine compliance with the Fair
Housing Act based <u>solely</u> on the number of people permitted in
each bedroom.  Indeed, as we stated in the final rule
implementing the Fair Housing Amendments Act of 1988, the
Department's position is as follows:

> [T]here is nothing in the legislative history which
> indicates any intent on the part of Congress to provide
> for the development of a national occupancy code. . . .

> On the other hand, there is no basis to conclude that
> Congress intended that an owner or manager of dwellings
> would be unable to restrict the number of occupants who
> could reside in a dwelling.  Thus, the Department believes
> that in appropriate circumstances, owners and managers may
> develop and implement reasonable occupancy requirements
> based on factors such as the number and size of sleeping
> areas or bedrooms and the overall size of the dwelling unit.
> In this regard, it must be noted that, in connection with a
> complaint alleging discrimination on the basis of familial
> status, the Department will carefully examine any such

Federal Register / Vol. 63, No. 245 / Tuesday, December 22, 1998 / Notices      70985

nongovernmental restriction to determine whether it operates unreasonably to limit or exclude families with children.

C.F.R. Chapter I, Subchapter A. Appendix I at 566-67 (1990).

Thus, in reviewing occupancy cases, HUD will consider the size and number of bedrooms and other special circumstances. The following principles and hypothetical examples should assist you in determining whether the size of the bedrooms or special circumstances would make an occupancy policy unreasonable.

## Size of bedrooms and unit

Consider two theoretical situations in which a housing provider refused to permit a family of five to rent a two-bedroom dwelling based on a "two people per bedroom" policy. In the first, the complainants are a family of five who applied to rent an apartment with two large bedrooms and spacious living areas. In the second, the complainants are a family of five who applied to rent a mobile home space on which they planned to live in a small two-bedroom mobile home. Depending on the other facts, issuance of a charge might be warranted in the first situation, but not in the second.

The size of the bedrooms also can be a factor suggesting that a determination of no reasonable cause is appropriate. For example, if a mobile home is advertised as a "two-bedroom" home, but one bedroom is extremely small, depending on all the facts, it could be reasonable for the park manager to limit occupancy of the home to two people.

## Age of children

The following hypotheticals involving two housing providers who refused to permit three people to share a bedroom illustrate this principle. In the first, the complainants are two adult parents who applied to rent a one-bedroom apartment with their infant child, and both the bedroom and the apartment were large. In the second, the complainants are a family of two adult parents and one teenager who applied to rent a one-bedroom apartment. Depending on the other facts, issuance of a charge might be warranted in the first hypothetical, but not in the second.

## Configuration of unit

The following imaginary situations illustrate special circumstances involving unit configuration. Two condominium associations each reject a purchase by a family of two adults and three children based on a rule limiting sales to buyers who satisfy a "two people per bedroom" occupancy policy. The first association manages a building in which the family of the five sought to purchase a unit consisting of two bedrooms plus a den or



...dy. The second manages a building in which the family of five ...ght to purchase a two-bedroom unit which did not have a study den. Depending on the other facts, a charge might be ...rranted in the first situation, but not in the second.

## ...her physical limitations of housing

In addition to physical considerations such as the size of ...ch bedroom and the overall size and configuration of the ...elling, the Department will consider limiting factors ...entified by housing providers, such as the capacity of the ...ptic, sewer, or other building systems.

## ...ate and local law

If a dwelling is governed by State or local governmental ...cupancy requirements, and the housing provider's occupancy ...licies reflect those requirements, HUD would consider the ...vernmental requirements as a special circumstance tending to ...dicate that the housing provider's occupancy policies are ...asonable.

## ...her relevant factors

Other relevant factors supporting a reasonable cause ...commendation based on the conclusion that the occupancy ...licies are pretextual would include evidence that the housing ...rovider has:  (1) made discriminatory statements; (2) adopted ...scriminatory rules governing the use of common facilities; ...) taken other steps to discourage families with children from ...iving in its housing; or (4) enforced its occupancy policies ...ly against families with children.  For example, the fact that ...development was previously marketed as an "adults only" ...evelopment would militate in favor of issuing a charge.  This is ...n especially strong factor if there is other evidence suggesting ...nat the occupancy policies are a pretext for excluding families ...ith children.

An occupancy policy which limits the number of <u>children</u> per ...nit is less likely to be reasonable than one which limits the ...umber of <u>people</u> per unit.

Special circumstances also may be found where the housing ...rovider limits the total number of dwellings he or she is ...illing to rent to families with children.  For example, assume a ...andlord owns a building of two-bedroom units, in which a policy ...f four people per unit is reasonable.  If the landlord adopts a ...our person per unit policy, but refuses to rent to a family of ...wo adults and two children because twenty of the thirty units ...lready are occupied by families with children, a reasonable ...ause recommendation would be warranted.

Federal Register / Vol. 63, No. 245 / Tuesday, December 22, 1998 / Notices

**70987**

If your review of the evidence indicates that these or other special circumstances are present, making application of a "two people per bedroom" policy unreasonably restrictive, you should prepare a reasonable cause determination.   The Executive Summary should explain the special circumstances which support your recommendation.

Doc. 98–33568 Filed 12–17–98; 8:45 am]
NG CODE BILLING CODE 4210–28–C

## EXHIBIT 7

TO

DECLARATION OF JESSE WING

IN SUPPORT OF PLAINTIFF'S RESPONSE

IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,

AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT



# WASHINGTON STATE HUMAN RIGHTS COMMISSION

## GUIDANCE MEMORANDUM

TO:        Commission Staff
               All Interested Parties

SUBJECT:   Occupancy Standards and Surcharges in Housing Discrimination
               Protection from discrimination against families with children

DATE:      February 20, 1998

The Commission is issuing this Guidance Memorandum with the intention of ensuring equitable application of the Washington State Law Against Discrimination in the area of protection against discrimination toward families with children.

With passage of amendments to RCW 49.60 in 1993, landlords can no longer have a blanket prohibition to renting to families with children. The era of "adults only" housing is over. The Washington State Legislature provided an exemption for apartments or communities that qualify as "housing for older persons" in 1997. However, the great majority of housing opportunities remain open for families with children.

Since 1993 families have found that other landlord policies have in effect barred them from renting certain apartments or houses. Those policies are frequently called occupancy standards (limiting the number of people who can occupy a unit) and surcharges (fee in addition to an amount of rent based on the number of people who occupy a unit).

Currently, landlords can set reasonable occupancy standards that are based on business needs. If a charge is filed, the Commission will look at many factors to determine if the occupancy standard violates RCW 49.60. The following is a list of some of the factors the Commission may consider. This list is not exhaustive nor would each of these factors be considered in every case. Rather, each case is reviewed with the specific circumstances of the charge and the specific housing in question.

GUIDANCE MEMORANDUM
Occupancy Standards
February 20, 1998
Page 2

1. Is the occupancy standard or surcharge applied to the number of people occupying a unit or is it applied to the number of children occupying a unit?
2. Is there a history of "adults only" rules, segregation or prohibitions by the landlord?
3. Are there families with children in the apartment complex, community or other rental property under the control of the respondent?
4. Is there evidence of rules directed at children that are not otherwise allowable due to safety concerns?
5. Is there any other information that supports or refutes the allegation that the occupancy standard or surcharge is being used in order to bar children from occupancy?
6. What business related factors has the landlord used to come to the occupancy standard or surcharge?
7. What are the local zoning or building occupancy limitations on the particular unit, house, apartment complex or community?
8. What is the size and configuration of the house or unit?
9. What is the size and configuration of the apartment complex or community?
10. Are there other structural or configuration elements which were considered?
11. Are utilities separately metered to each unit and the responsibility of the tenant?
12. Are utilities metered and paid by the landlord?
13. If so, how does the landlord recoup the cost of the utilities?
14. Does the landlord have evidence of actual increased use of utilities?
15. What is the percentage of families with children (and families with one, two, three, etc. children) in the local population (assuming that the local population comprises the pool of prospective tenants)?
16. What is the age and condition of the structure and its accompanying systems (electric, water, and sewer)?
17. Is on-street or off-street parking space a consideration?  If so, how?

After gathering all the relevant information, the Commission must then determine whether the occupancy standard or surcharge violates RCW 49.60.  Occupancy standards that are less than 2 persons per bedroom generally will raise a question of lawfulness.  The justification for the limit will need to show that it is reasonable in light of one or more of the factors noted above.

Surcharges that are not related to increased costs generally will raise a question of lawfulness. The justification for the surcharge will need to show that it is reasonable in light of one or more of the factors noted above.

It is the intent of the Commission to protect the civil rights of families with children and also the intent of the Commission to assist landlords to make reasonable business decisions which are not in violation of the law.  Each case presents a unique set of facts and the parties need the opportunity to present evidence that assists the Commission to administer the law.



## **EXHIBIT 8**

TO

DECLARATION OF JESSE WING

IN SUPPORT OF PLAINTIFF'S RESPONSE

IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,

AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

OCCUPANCY STANDARDS 101 FOR HOUSING PROVIDERS
By Karen Peirolo

**Q: "I have a 2 persons per bedroom occupancy standard and I refused to rent a 2-bedroom unit to a couple with three children. Now I just received a complaint from this family filed with the Washington State Human Rights Commission – what did I do wrong?"**

**A: Someone may have told you that it's okay to limit occupancy to 2 persons per bedroom. Don't believe it!** The ubiquitous 2-per-bedroom occupancy standard is simply a very general guideline provided by HUD - IT IS NOT AN ABSOLUTE! All enforcement agencies still review a number of factors to determine whether an occupancy standard is overly restrictive. Simply establishing a 2-per-bedroom standard without making a determination of its reasonableness for the specific unit involved may not protect you from a finding that the standard is overly restrictive.

When a housing provider limits the number of occupants in a unit, it impacts families with children more severely than families without children. Under the fair housing laws, housing providers can set reasonable occupancy standards that are based on business needs; however, the adverse effect of occupancy standards on families with children requires that housing providers justify the use of such standards. Every charge filed by a family with children involving occupancy standards is reviewed on a case-by-case basis because each case presents a unique set of facts.

The State Human Rights Commission (HRC) makes a determination as to whether an occupancy standard is reasonable and in compliance with the fair housing laws by reviewing relevant factors outlined in a 1998 guidance memorandum issued by HRC Commissioners. As a housing provider, knowledge of what goes into the HRC's evaluation of occupancy standards should assist you in making reasonable business decisions in compliance with the fair housing laws.

Here's what you should do if you choose to establish an occupancy standard:

1) **Measure!** Get out the measuring tape and measure the rooms in your rental unit - specifically the dimensions for each bedroom, living room, extra room, library, den, home office, etc. For each unit, have a floor plan that clearly illustrates the size and configuration of the unit.
2) **Find the applicable code!** Find out which local zoning or building occupancy limitations apply to your unit, house, apartment complex or community. Apply this occupancy guideline to your units based on each unit's specific size and configuration determined in #1 above - the resulting number of occupants the applicable guideline allows is the basis for your occupancy standard!
3) **Be prepared to substantiate business-related factors!** If there are business-related factors such as the age or condition of your dwelling and its accompanying systems (sewer, septic, electric, water, etc.) which require a more restrictive occupancy standard be prepared to establish a clear relationship between the business-related

factor and the occupancy standard.  For example, if a septic system has a limited capacity, be prepared to substantiate that factor by a statement from someone capable of making that determination.  Also be prepared to show whether you looked at other ways to address a limited septic system that do not require a restrictive occupancy standard, such as installing water saving devices or pumping the system more frequently.

Additional factors could also be relevant in evaluating an occupancy standard case.  For example, the HRC may need to determine whether the occupancy standard is *applied to* the number of *people* or the number of *children* occupying a unit.  The HRC may also look at whether there is a history of "adults only" rules, segregation of families or rules directed only at children.  Overall, the HRC will determine whether there is any other information that supports or refutes the allegation that the occupancy standard is being used to bar or limit children from occupancy.

It is the intent of enforcement agencies to protect the civil rights of families with children. It is also the intent of enforcement agencies to assist housing providers to make reasonable business decisions which are in compliance with the law.  Each case presents a unique set of facts and will be determined on a case-by-case basis; however, housing providers who establish reasonable occupancy standards based on the above criteria will have a head start.

If you have any additional questions or would like a copy of the HRC's guidance memorandum on occupancy standards, call Karen Peirolo at 206-464-6500.  You can also visit the HRC website at www.wa.gov/hrc.

# **EXHIBIT 9**

TO

DECLARATION OF JESSE WING

IN SUPPORT OF PLAINTIFF'S RESPONSE

IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,

AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# Seattle Municipal Code

## Chapter 22.206 - HABITABLE BUILDINGS

Sections:

**Subchapter I - Minimum Space and Occupancy Standards**

**22.206.010 - Reserved.**

(Ord. 113545 § 5(part), 1987.)

**22.206.020 - Floor area.**

A.      Every dwelling unit shall have at least one (1) habitable room which shall have not less than one hundred twenty (120) square feet of floor area.

B.      No habitable room except a kitchen may be less than seven feet (7') in any floor dimension.

C.      Every room used for sleeping purposes, including an SRO unit, shall have not less than seventy (70) square feet of floor area. Every room, except an SRO unit, which is used for both cooking and living or both living and sleeping quarters shall have a floor area of not less than one hundred thirty (130) square feet if used or intended to be used by only one (1) occupant, or of not less than one hundred fifty (150) square feet if used or intended to be used by two (2) occupants. Where more than two (2) persons occupy a room used for sleeping purposes, the required floor area shall be increased at the rate of fifty (50) square feet for each occupant in excess of two (2).

D.      In a dormitory, minimum floor area shall be sixty (60) square feet per single or double bunk, and aisles not less than three feet (3') in width shall be provided between the sides of bunks and from every bunk to an exit. The requirements of this subparagraph shall not apply to SRO units.

E.      The required floor area square footage of all dwelling units, dormitories, and SRO units shall not include built-in equipment which extends from the floor to thirty inches (30") above the floor, including but not limited to wardrobes, cabinets, and kitchen sinks or appliances.

(Ord. 115671 § 9, 1991; Ord. 113545 § 5(part), 1987.)